Tax Court of Canada - Electronic Filing                                    Page 1 of 1



| Français | Home | Site Map | About the Court | Court Process and Procedures | Judgments |
|---|---|---|---|---|---|
| Court Files | Electronic Filing | Search | Courts/Justice System | Contact us | Help |

# Tax Court of Canada
www.tcc-cci.gc.ca

Self-Represented Litigants | Counsel | Law Students | Media & Public

## File Documents

### Confirmation

Thank you for using the Tax Court of Canada's Online Filing System.

An electronic copy of your document(s) has(have) been received at the Tax Court of Canada.

Your Reference Number is: WEB539516

**Session Details**

Submitted on: June 23, 2010 3:00:54 EDT PM
Appellant's First Name: Jeffrey
Appellant's Surname: Sackman
Appeal Number: 2002-4824(IT)G

| Type of Document | Document Name |
|---|---|
| Miscellaneous | Filing letter to TCC.pdf |
| | Conent to File Amended |
| Miscellaneous | Reply.pdf |
| Reply to notice of appeal | Further Amended Reply.pdf |

Please save or print this page for your records.

Your comments are important to us. Please give us some <u>feedback</u> on the use of our Online Filing System.

## Close Session

Modified date: 2009-06-10                                    <u>Important Notices</u>

**Exhibit D**

2002-4824(IT)G

## TAX COURT OF CANADA

BETWEEN:

### JEFFREY SACKMAN

Appellant

and

### HER MAJESTY THE QUEEN

Respondent

---

# RESPONDENT'S MOTION RECORD

---

Teplitsky Colson
Barristers and Solicitors
70 Bond Street, Suite 200
Toronto, Ontario
M5B 1X3

Myles J. Kirvan
Deputy Attorney General of Canada
Department of Justice
Ontario Regional Office
Tax Law Services Section
The Exchange Tower
130 King St. West
Suite 3400, Box 36
Toronto, Ontario
M5X 1K6

Martin Teplitsky, Q.C.
Matthew Sokolsky
Counsel for the Appellant

Jenna Clark/Martin Beaudry
Erin Strashin
Counsel for the Respondent

INDEX

**INDEX**

| TAB | |
|---|---|
| 1. | Notice of Motion |
| 2. | Affidavit of Laura Alescio |
| | Exhibit A – Artistic's Document for 1999 |
| | Exhibit B – *Artistic Ideas Inc. v Canada (Minister of National Revenue)*, 2008 TCC 452 |
| | Exhibit C – Page 39 of the Transcript of the Examination for Discovery of Jeffery Sackman, December 11, 2006 |
| | Exhibit D – Page 42 of the Transcript of the Examination for Discovery of Jeffery Sackman, December 11, 2006 |
| | Exhibit E – Pages 197 through to 214 of the Transcript of the Examination for Discovery of Jeffery Sackman, January 15, 2007 |
| | Exhibit F – Documents from Ro Gallery |
| | Exhibit G – Pages 161 through to 166 of the Transcript of the Examination for Discovery of Jeffery Sackman, January 15, 2007 |
| | Exhibit H – *Sackman v Canada*, 2008 FCA 177 |
| | Exhibit I – Letter to Joyce Harris of Teplitsky Colson from Laura Alescio of Department of Justice, dated September 7, 2004 |
| | Exhibit J – Letter to Laura Alescio of Department of Justice from  Joyce Harris of Teplitsky Colson, dated September 8, 2004 |
| | Exhibit K – Motion Record filed by counsel for Artistic Ideas Inc. which includes a Notice of Motion dated September 1, 2006 and an affidavit sworn by Paul Sloan dated August 31, 2006 |
| | Exhibit L – Transcript of Evidence given by Paul Sloan on November 29, 2006 |
| | Exhibit M – Exhibits to the ommission of Paul Sloan held November 29, 2006 |
| | Exhibit N – Tab 59, 62, 63, 64, 77, 78, 79 and 98 of the Respondent's 2nd Supplementary List of Documents |
| | Exhibit O – Request to Admit together with covering letter, without attachments, both dated August 19, 2010 |
| | Exhibit P – Letter to the Department of Justice from Matthew Sokolsky of Teplitsky Colson dated August 23, 2010 |

|   | Exhibit Q - Letter to Paul Sloan from the Department of Justice dated August 25, 2010 |
|---|---|
|   | Exhibit R - Letter to Paul Sloan from the Department of Justice dated September 13, 2010, without enclosed transcript |
|   | Exhibit S – Letter to Martin Teplitsky of Teplitsky Colson from the Department of Justice dated February 25, 2011 |
|   | Exhibit T – Letter to the Department of Justice from Martin Teplitsky of Teplitsky Colson dated March 1, 2011 |

1

2002-4824(IT)G

## TAX COURT OF CANADA

**BETWEEN:**

### JEFFREY SACKMAN

Appellant

- and -

### HER MAJESTY THE QUEEN

Respondent

## <u>NOTICE OF MOTION</u>

**TAKE NOTICE THAT** the Respondent will make a motion to the Court on October 14, 2011 at 9:30 a.m. or as soon thereafter as counsel may be heard at the Tax Court of Canada, Federal Judicial Centre, 180 Queen Street West, 6th Floor, Toronto, Ontario.

**THE MOTION IS FOR** a Direction

    a) pursuant to section 119 of the *Tax Court of Canada Rules (General Procedure)* (the "Rules") granting leave to examine Mr. Paul Sloan, in California, USA, before the hearing of this appeal, on oath or affirmation, for the purpose of having his testimony available to be tendered as evidence at the hearing of the appeal; and

    b) pursuant to sections 112, 119, 120 and 121 of the Rules, providing for

-2-

    i)    the issuance of a commission authorizing the taking of evidence before a named commissioner;

    ii)    the appointment of the trial judge as the named commissioner; and

    iii)    the issuance of a letter of request directed to the judicial authorities of the State of California, USA, for the issuance of such process as is necessary to compel Paul Sloan to attend and be examined before the commissioner.

**THE GROUNDS FOR THE MOTION ARE:**

1. The Respondent has determined it necessary to call Paul Sloan, a resident of California, as a witness at trial as Mr. Sloan can give evidence about material facts in dispute.

2. The Respondent will be prejudiced if Mr. Sloan's evidence is not made available to the trial judge.

3. Mr. Sloan does not want to travel to Canada for the purpose of testifying at trial.

4. There is no apparent prejudice to the Appellant.

5. This application is made *bona fide* and not for any improper purpose.

6. The Respondent relies on sections 112, 119, 120, 121 and 122 of the Rules.

-3-

**THE FOLLOWING DOCUMENTARY OR OTHER EVIDENCE** may be used at the

hearing of the motion:

1.  the affidavit of Laura Alescio, to be sworn and served in advance of the hearing of

    the motion;

2.  the pleadings and lists of documents filed in this appeal; and

3.  such further and other material as counsel may advise and this Honourable Court

    permit.

**THE ESTIMATED DURATION** of this hearing will be approximately two hours.

DATED at the City of Ottawa, Ontario, this 30th day of May, 2011.

Myles J. Kirvan
Deputy Attorney General of Canada

Per:     Jenna Clark
         Martin Beaudry
         Erin Strashin
         Counsel for the Respondent

         Department of Justice
         Tax Law Services Section
         Bank of Canada Building
         East Tower, 9th Floor
         234 Wellington Street
         Ottawa, Ontario
         K1A 0H8

         Telephone:   (613) 957-4814
         Facsimile:   (613) 941-2293

-4-

**TO:**        Tax Court of Canada
200 Kent Street
4th Floor
Ottawa, Ontario
K1A 0M1


**AND TO:**    Martin Teplitsky, Q.C.
Matthew Sokolsky
Teplitsky Colson
Barristers and Solicitors
70 Bond Street, Suite 200
Toronto, Ontario
M5B 1X3

2

2002-4824(IT)G

## TAX COURT OF CANADA

BETWEEN:

### JEFFREY SACKMAN

Appellant

- and -

### HER MAJESTY THE QUEEN

Respondent

## <u>AFFIDAVIT</u>

I, Laura Alescio, of the City of Toronto, in the Province of Ontario, MAKE OATH AND SAY AS FOLLOWS:

1.    I am employed as a paralegal in the Tax Law Services Section of the Department of Justice in Toronto, Ontario.  I provide paralegal support with respect to this appeal and as such have personal knowledge of the matters hereinafter deposed to, save and except what is stated to be on information and belief, and where so stated, I verily believe them to be true.

2.    This appeal concerns the reassessment of the appellant's 2000 taxation year, wherein the Minister of National Revenue disallowed a tax credit claimed by the appellant in respect of donated art prints.

-2-

3. I make this affidavit in support of a motion brought by the Attorney General of Canada in the Tax Court of Canada seeking a direction to obtain evidence from Paul Sloan in California, USA through a Commission, and for no other or improper purpose.

4. The Respondent listed a document from Artistic Expressions, renamed in 1999 as Artistic Ideas ("Artistic"). Attached to this my Affidavit and marked as Exhibit "A" is a true copy of Artistic's document, listed as document 40 on the Respondent's Supplementary List of Documents (Partial Disclosure).

5. The Tax Court of Canada issued a decision in a G.S.T. appeal, *Artistic Ideas Inc. v Canada (Minister of National Revenue)*, 2008 TCC 452 (the "Artistic appeal"). Attached to this my Affidavit and marked as Exhibit "B" is a true copy of the Reasons for Judgment in the Artistic appeal.

6. At examination for discovery the appellant agreed that he understood he was appointing Artistic Ideas as his agent for the purposes of carrying out donations of prints to charities in return for charitable donation receipts. Attached to this my Affidavit and marked as Exhibit "C" is a true copy of an excerpt from the transcript of the Examination for Discovery of Jeffrey Sackman conducted on December 11, 2006, title page 1 and page 39 where this statement was made.

7. The Appellant stated during examination for discovery that he understood he purchased art from Coleman Fine Arts ("Coleman") and Silver Fine Arts ("Silver"). Attached to this my Affidavit and marked as Exhibit "D" is a true copy of an excerpt from the transcript of the Examination for Discovery of Jeffrey

Sackman conducted on December 11, 2006, title page 1 and page 42 where this statement was made.

8.   The appellant produced two binders of documents before the examination for discovery of the appellant. Among these documents were invoices from the Ro Gallery in New York. Attached to this my Affidavit and marked as Exhibit "E" is a true copy of an excerpt of the transcript of the examination for discovery of Jeffrey Sackman held on January 15, 2007, title page 85 and pages 197 through to 214, where the appellant through his counsel discussed these invoices. Attached to this my Affidavit and marked as Exhibit "F" is a true copy of several of the documents produced by the appellant in 2006, with page numbers added by the respondent.

9.   The appellant stated at the examination for discovery that he has no information as to how Coleman and Silver obtained the prints that he purchased and acquired through Artistic. The appellant stated at examination for discovery that he did not have any knowledge about what Artistic or Coleman or Silver paid for the prints that he bought and donated. Attached to this my Affidavit and marked as Exhibit "G" is a true copy of an excerpt of the transcript of the examination for discovery of Jeffrey Sackman, held on January 15, 2007, title page 85 and pages 157 through to 163, wherein the appellant makes this statement.

-4-

10.     The Federal Court of Appeal rendered a decision permitting the respondent to pose six questions to Artistic in a non-party examination. Attached to this my Affidavit and marked as Exhibit "H" is a true copy of the decision of the Federal Court of Appeal dated May 8, 2008, in the matter of *Sackman v Canada*, 2008 FCA 177.

11.     On September 7, 2004, I sent a letter to the office of Teplitsky Colson, counsel for the appellant, seeking information relating to this appeal. Attached to this my Affidavit and marked as Exhibit "I" is a true copy of the letter that I sent to Joyce Harris of Teplitsky Colson, with attachments.

12.     Ms. Harris sent me a letter by fax declining to answer these questions. Attached to this my Affidavit and marked as Exhibit "J" is a true copy of this letter sent to me by fax dated September 8, 2004.

13.     I have reviewed a Motion Record dated September 1, 2006 served on the Crown by Artistic, for the Artistic appeal. Attached to this my Affidavit and marked as Exhibit "K" is a true copy of the Motion Record which includes a Notice of Motion dated September 1, 2006 and an affidavit sworn by Paul Sloan dated August 31, 2006.

14.     I have reviewed the transcript of the commission of Paul Sloan, held on November 29, 2006. Attached to this my Affidavit and marked as Exhibit "L" is a true copy of the entire transcript of evidence given by Paul Sloan. I have also attached to this my Affidavit and marked as Exhibit "M" is a true copy of the exhibits to the commission of Paul Sloan held November 29, 2006.

-5-

15.   Copies of invoices and other documents issued by Ro Gallery to Silver or Coleman are listed on the Respondent's 2nd Supplementary List of Documents. Attached to this my Affidavit and marked as Exhibit "N" is a true copy of these copies of documents listed at numbers 59, 62, 63, 64, 77, 78, 79 and 98 of the Respondent's 2nd Supplementary List of Documents.

16.   The respondent served the appellant with a Request to Admit dated August 19, 2010. Attached to this my Affidavit and marked as Exhibit "O" is a true copy of the Request to Admit, with covering letter, without attachments, dated August 19, 2010.

17.   I have reviewed a letter dated August 23, 2010 wherein the appellant advised counsel for the respondent that he had no knowledge of and refused to admit any of the facts and documents stated in the Request to Admit. Attached to this my Affidavit and marked as Exhibit "P" is a true copy of the letter dated August 23, 2010 sent by counsel for the appellant.

18.   I am advised by Martin Beaudry, counsel for the respondent, that he sent a letter dated August 25, 2010 to Mr. Sloan to discuss Mr. Sloan's voluntary attendance as a witness for the respondent at the hearing of this appeal. Attached to this my Affidavit and marked as Exhibit "Q" is a true copy of said letter.

19.   I am advised by Mr. Beaudry that on September 8, 2010, he spoke with Mr. Sloan by telephone. During the conversation, Mr. Sloan told Mr. Beaudry that he will not voluntarily attend at trial in Canada. Mr. Sloan said that he does not want to travel to Canada. Mr. Sloan said that he does not understand why his evidence is needed again.

-6-

20.   Mr. Beaudry advised me that he sent a letter dated September 13, 2010 to Mr. Sloan confirming his refusal to attend at trial in Canada. The letter notified Mr. Sloan that the only other way that the respondent could obtain his testimony was by commission. A copy of Mr. Sloan's commission evidence was enclosed with the letter. Attached to this my Affidavit and marked as Exhibit "R" is a true copy of that letter, but without the enclosed transcript.

21.   I am advised by Mr. Beaudry that on February 25, 2011 he wrote to the appellant to ask if he would consent to a motion seeking an Order for a Commission to be held in California, United States. Attached to this my Affidavit and marked as Exhibit "S" is a true copy of the letter dated February 25, 2011.

22.   I reviewed a letter dated March 1, 2011, wherein counsel for the appellant wrote back advising that he cannot consent. Attached to this my Affidavit and marked as Exhibit "T" is a true copy of the letter dated March 1, 2011.

SWORN BEFORE me at the City of )
Toronto, in the Province of Ontario, this )
30th day of September, 2011. )
 )
 )
 )
_____ )   _Laura Alescio_
A Commissioner for Oaths in and )   Laura Alescio
for the Province of Ontario )
 )
CHRISTOPHER M. BARTLETT

A

**THIS IS EXHIBIT "A"**
**referred to in the affidavit of**
**Laura Alescio**
This __30th__ day of September, 2011

**Commissioner for Taking Affidavits**

# Artistic Expressions '99

**THE OPPORTUNITY:**

### DONATE ART TO VARIOUS CHARITIES AND RECEIVE A SUBSTANTIAL TAX INCENTIVE

| | |
|---|---|
| Minimum Investment Amount | $ 3,500 |
| Donation Receipt | $10,000 |
| Tax Savings | $ 4,875* (39.29% return) |

\*    Based on Ontario tax rates after having given the first $200 in charitable gifts.

---

### TAX OPINION AVAILABLE ON REQUEST

---

### TWO QUALIFIED APPRAISERS TO SUBSTANTIATE THE FAIR MARKET VALUE OF THE ART

---

AFTER PURCHASING ELEVEN PIECES OF ART EACH INVESTOR WILL BE ABLE TO DONATE UP TO TEN OF THE PIECES. EACH WORK OF ART HAS AN APPRAISED MARKET VALUE OF AT LEAST $1000. INVESTORS WHO CHOOSE TO DONATE TEN PIECES OF ART WILL ACHIEVE TAX SAVINGS OF $4875 AND A PIECE OF ART VALUED AT APPROXIMATELY $1000.

D 28

B

**THIS IS EXHIBIT "B"**
**referred to in the affidavit of**
**Laura Alescio**
**This 30ᵗʰ day of September, 2011**

_____
**Commissioner for Taking Affidavits**

*Case Name:*
## Artistic Ideas Inc. v. Canada (Minister of National Revenue - M.N.R.)

**Between**
**Artistic Ideas Inc., Appellant, and**
**The Minister of National Revenue, Respondent**

[2008] T.C.J. No. 413

[2008] A.C.I. no 413

2008 TCC 452

2008 G.T.C. 727

[2008] G.S.T.C. 160

Court File No. 2003-1855(GST)G

Tax Court of Canada
Toronto, Ontario

**Paris T.C.J.**

Heard: September 5-8, 2006, and June 11-14, 2007.
Judgment: August 7, 2008.

(106 paras.)

*Taxation -- Goods and Services Tax (GST) -- Collection and enforcement -- Persons obligated to collect -- Appeal from an assessment made under the Excise Tax Act which found that the appellant should have collected GST allowed in part -- Appellant argued it did not need to collect GST as it did not charge any commissions and that any services performed were done for no charge -- Respondent argued that this arrangement was a sham -- The respondent did not succeed in showing that the agreements entered into by the purchasers were shams.*

Appeal from an assessment made under the Excise Tax Act. The appellant operated a program that amounted to a tax shelter. The appellant arranged for Canadian residents to purchase lithographic prints at less than their supposed fair market value from two US vendors and donate the prints to charities and receive a donation receipt for their supposed fair market value. The assessor found that the appellant should have been collecting GST on its commissions and that it owed GST as well as other input tax credits. The respondent argued that the appellant received commissions or fees of $10,588,970 from the purchasers of the prints as consideration for services the appellant supplied to the purchasers in Canada. The appellant argued that it did not charge any commissions to the purchasers, that it received its commissions from the US vendors and that any services performed for the purchasers were done for no

charge. The respondent argued that this arrangement was a sham.

HELD: Appeal allowed in part. The assessment was referred back to the Minister of National Revenue for reconsideration. It was clear from the evidence that the purchasers did not agree to pay anything to the appellant for the services. The Agency Agreement expressly required the appellant to look to the dealers from which the prints were acquired for any commission. The respondent did not succeed in showing that the agreements entered into by the purchasers were shams. Therefore there was no basis on which to find that the commissions received by the appellant were paid by the purchasers. No evidence was led to show that the appellant exercised due diligence in reporting its input tax credits and no argument on the point was presented. Therefore there was no basis for deleting the penalty.

**Statutes, Regulations and Rules Cited:**

Excise Tax Act, R.S.C. 1985, c. E-15, s. 165(1)

**Counsel:**

Counsel for the Appellant: Irving Marks and Shawn Pulver.

Counsel for the Respondent: Perry Derksen and P. Michael Appavoo.

---

**JUDGMENT**:-- The appeal from the assessment made under Part IX of the *Excise Tax Act*, notice of which bears number 05B 8247 and is dated March 4, 2002, is allowed, in part, with costs, and the assessment is referred back to the Minister of National Revenue for reconsideration and reassessment in accordance with the attached Reasons for Judgment.

## REASONS FOR JUDGMENT

1    PARIS T.C.J.:-- Between November 4, 1998 and January 31, 2001, the Appellant, Artistic Ideas Ltd., ("Artistic") operated what it referred to as an "art donation program". For all intents and purposes the program was a tax shelter[1]. Artistic arranged for Canadian residents to purchase lithographic prints at less than their supposed fair market value from two US vendors and donate the prints to charities and receive a donation receipt for their supposed fair market value. This enabled purchasers paying income tax at the highest marginal rate to claim tax credits for charitable donations in excess of the amount they paid for the prints.

2    Artistic earned commissions totaling $10,588,970 from it operations during the relevant period. It did not collect GST on the services for which it received the commissions.

3    The Minister of National Revenue (the "Minister") assessed Artistic for $741,228 of GST under Part IX of the *Excise Tax Act*, (the "*Act*") on the basis that the commissions were received from the purchasers of the prints for taxable supplies made by Artistic to them in Canada. The Minister also assessed an additional $21,213.72 of GST for a re-supply of art work by Artistic, and disallowed $144,599.89 of input tax credits and imposed a penalty of $99,129.37 under subsection 280(1) of the *Act* on the unremitted GST and the over-claimed input tax credits.

Concessions

4    The Respondent now concedes that the GST on the re-supply of artwork should be reversed, and

that the Appellant is entitled to $52,118,96[2] of the disallowed input tax credits.

**5**     The Respondent also concedes that the Appellant was entitled to an allowance under subsection 296 (2.1) of the *Act* for GST paid in error of $1,050.00 for the period ending January 31, 2000, and $1,693.30 for the period ending January 31, 2001.

**6**     Finally, the Respondent also concedes that if Artistic is found to have received the commissions as consideration for taxable supplies, it would be entitled to offset GST of $110,762.86 that it previously reported against the GST collectible on the taxable supplies in issue[3].

Issues in appeal

**7**     The first issue in appeal is whether Artistic was required to collect GST in respect of the services for which it received the commissions.

**8**     If it is found that Artistic was required to collect GST, the second issue is whether the Minister properly calculated the amount of GST due, and the third issue is whether Artistic is liable for the subsection 280(1) penalty on the amount due.

**9**     The final issue is whether Artistic is liable for the subsection 280(1) penalty in respect of the disallowed input tax credits.

Position of the parties

Appellant

**10**     The Appellant says that the commissions did not attract GST because they were paid by the US vendors to the Appellant for acting as the vendors' agent arranging for orders for the prints which the vendors supplied to the purchasers outside Canada. The Appellant says that the services to the vendors were therefore zero rated pursuant to section 5 of schedule IV of Part V of the *Act*.

**11**     If it is found that any consideration was received from the purchasers, the Appellant says that the services that the Appellant supplied to the purchasers were incidental to the supply of the agent services to the US vendors and should be treated as incidental supplies having the same character as the main supply pursuant to section 138 of the *Act* and therefore would be zero rated supplies.

**12**     In the alternative, if any amounts were paid to it by the purchasers, only 5% of the commissions it received would be attributable to services supplied to the purchasers. Also, the Appellant says that the GST was included in the amounts paid.

**13**     The Appellant says that it exercised due diligence to ensure it collected and remitted the GST required under the *Act* and is not liable for the penalty.

Respondent

**14**     The Respondent says that the commissions were paid to the Appellant by the purchasers of the prints for services supplied to them by the Appellant in Canada. The services were therefore taxable supplies on which the Appellant was required to collect and remit GST in respect of the services supplied to them pursuant to subsection 165(1) of the Act. The supplies to the purchasers were separate and substantial supplies and not incidental to any supplies made to the US vendors. The GST was not included in the consideration paid to the Appellant by the purchasers, and the penalty was properly imposed.

Witnesses

**15**   Seven witnesses gave evidence on behalf of the Appellant: the two directors of the Appellant, Mark Pearlman ("Pearlman") and Allan Grossman ("Grossman"); the Appellant's tax lawyer, Graham Turner; the principal of the U.S. vendor companies; Paul Sloan, ("Sloan") the Appellant's office administrator, Susan Read; an art appraiser retained by the Appellant, Edith Yeomans; and an accountant who prepared the Appellant's financial statements and tax returns, Dan Kowalchuk.

Facts

**16**   The Appellant was incorporated in the fall of 1998 by Pearlman and Grossman to operate the art donation tax shelter. The shares of the Appellant were owned beneficially by companies owned by Pearlman's and Grossman's spouses and by a company owned by an unrelated person. Pearlman and Grossman were at all times the only directors. They are both chartered accountants.

**17**   Both Pearlman and Grossman gave evidence that the idea of setting up and operating an art donation tax shelter was suggested to them sometime in or around 1997 by Sloan, a resident of Los Angeles, California. Pearlman and Grossman had become acquainted with Sloan in the mid-1990s, and had worked together promoting a software tax shelter named Protosource that was marketed to Canadian taxpayers in 1995 and 1996. That tax shelter was apparently also conceived by Sloan.

**18**   According to Grossman and Pearlman, Sloan was aware of certain art donation tax shelters that were being marketed in Canada and he proposed to Pearlman and Grossman that they (i.e. Pearlman and Grossman) set up such a tax shelter using lithographic prints that Sloan had left in inventory over from some art galleries that he used to own in the United States. Sloan supposedly had a very large volume of prints available.

**19**   Pearlman explained the program in the following terms:

> "The art tax shelter was sort of based on the concept of what we thought the definition of fair market value was or our understanding of the definition of fair market value, being one that would reflect a retail price of something.
>
> If one could buy something at a wholesale price, if one could buy something at a wholesale price and donate that property, then if the differential between the retail price and the wholesale price was substantial enough, the tax benefit would turn a profit for the person making the purchase and donation."[4]

**20**   Initially, Pearlman and Grossman declined Sloan's proposal because they were involved in other projects, and because Pearlman had concerns about the application of the personal-use property provisions of the *Income Tax Act* to art donation tax shelters. Pearlman said that some time later he discussed the technical aspects of the proposed tax shelter with Graham Turner, ("Turner") a tax lawyer with whom he was acquainted, and satisfied himself that the tax shelter was, in fact, technically workable.

**21**   Pearlman and Grossman contacted Sloan and said that they were interested in working with him on the deal if he was still interested in supplying the art. Pearlman said that they discussed the need to be able to have art that they could buy for a third of its "retail value" and Sloan assured them that he could provide appraisals to support the required retail values.

**22**   Sloan said that in the conversation in which Pearlman and Grossman expressed their interest in

doing the tax shelter, they said they could be his agents in Canada, and he said he would give them a 50% commission. He said that the agent/principal relationship was their idea, and he accepted it because that is what they wanted.

**23**   According to Pearlman's and Grossman's testimony, their decision to act as Sloan's agent was not made until a later point, after Pearlman and Grossman had consulted again with Turner. First, they said that they began working out the details of their arrangement and "crunching the numbers to see what would work."

**24**   Pearlman said that they told Sloan that they wanted to sell the prints in groups of ten and proposed a price to the purchaser of $3,500 which they would share "50-50" with Sloan. Sloan would provide an appraisal for at least $1,000 per print and pay for shipping the art to Toronto, and Pearlman and Grossman would market the art and find charities to accept the donations. Sloan said that he could work with the proposed arrangement.

**25**   Pearlman and Grossman then met with Turner to discuss the deal and to confirm that he would provide a favorable tax opinion for it. Pearlman said that among other things they discussed he and Pearlman acting as Sloan's agent for selling the art, and also discussed whether GST would be payable on the purchases.

**26**   Pearlman said and it was decided that the sale of the prints would take place in the U.S. between Sloan or his companies, and that the purchaser would donate the prints while they were still located in the U.S. This way no GST would be payable by the purchaser, and the prints could be brought into Canada by the charity on a tax- exempt basis. Donations could be made as soon as the purchaser acquired the prints, making it possible to sell the prints right up to the end of the calendar year.

**27**   Grossman, Pearlman and Turner also decided that the prints should be sold in groups of eleven so that the buyer could retain one of the prints, in order to "give it more of a flavour of personal-use property."

**28**   Turner recalled having met with Pearlman and Grossman about setting up the tax shelter and discussing the GST implications of the deal, and the fees to be paid by Sloan's companies. He said that everything that was done [by Pearlman and Grossman] for Sloan's companies was done in the U.S. "so it was not a GST issue as far as we were concerned."

**29**   Grossman said that after discussions with Turner, they told Sloan that the best way to carry out the sales of the prints was for Grossman and Pearlman to act as his agent, that they would market the art program for him and that they would get paid a commission of 50%.

**30**   Pearlman and Grossman told Sloan that they wanted him to supply eleven prints for the same price as previously agreed, and that they "still needed 50% of the selling price." They also proposed that, rather than having the buyer pay the sales taxes on the eleventh print when it was imported, Sloan should pay half and they should pay half. Pearlman also said that Sloan agreed to the procedure that he and Grossman were suggesting for the sale of the prints and that Sloan knew that he [Sloan] was selling art to the purchasers and paying a fee to Pearlman and Grossman from the purchaser price.

**31**   The agreement between Sloan, Pearlman and Grossman was never put in writing. Pearlman and Grossman said they all trusted one another as a result of their earlier dealings, and did not feel the need for a written contract. Pearlman said that they often did deals on a handshake. On the other hand, Sloan said Grossman was supposed to come up with a written agreement but never did and that after the first year of operation a comfort level had been established. Turner said that he asked Grossman and Pearlman about drafting a written agreement but they had assured him that they had a deal with Sloan

that was not in writing.

**32**   In the early fall of 1998 Sloan sent up some prints along with appraisals, but Pearlman and Grossman felt that the appraisals were too high and were not credible. They told Sloan that they wanted to arrange for their own appraisals and they wanted Sloan to pay for them. Once again, Sloan agreed, and Pearlman and Grossman hired Edith Yeomans, ("Yeomans") and a second appraiser, Leslie Finks, to supply the appraisals.

**33**   Turner prepared the tax opinion and drafted the agreements to be signed by the purchasers of the prints. In the tax opinion Turner stated that the prints were to be acquired by the purchasers from the US vendors for $3,500 per set. Turner said that there was no provision in any of the documents he drafted for payment of any commission or fee by the purchasers to Artistic because Artistic was selling art as agent for the US vendors and was not involved in a fee-generating process vis-à-vis the purchasers. Both Pearlman and Grossman denied charging any fees or commission to the purchasers.

**34**   Grossman found charities willing to accept donations of the prints and give a charitable receipt for $1,000 per print and Pearlman and Grossman incorporated the Appellant. They made up some marketing materials, a catalogue of prints to be offered and organized a sales force of commission sub-agents to sell the prints and an office staff to process the orders.

**35**   Sloan sent samples of prints to the Appellant for Yeomans to appraise. Prints that she felt had a value of at least $1,000 CND were included in groupings of prints that were offered for sale. Yeomans said that she initially gave verbal assurances regarding the value of the prints and then provided written appraisals after the calendar year end. She said that the work of researching the prints was done prior to giving the verbal assurances of value, and that all that remained to be done was to put the appraisal in writing. Grossman was unable to say whether similar verbal assurances were given by the second appraiser prior to the sale of the prints.

**36**   The Appellant began selling the prints in November 1998. Purchasers were required to sign a Purchase Agreement, an order form and an Agency Agreement as well as a Deed of Gift.

**37**   The vendor of the prints under the Purchase Agreements entered into in 1998, 1999 and the first half of 2000 was Coleman Fine Arts Ltd. ("Coleman"), a company owned by Sloan. In the latter part of 2000, Silver Fine Arts Ltd. ("Silver"), another company owned by Sloan, became the vendor. No reason was given for this change.

**38**   The purchase price was $3,500 per set of eleven prints. This was set out in the order form, which was incorporated by reference into the Purchase Agreement. The price was stated to include GST and PST "where applicable". Pearlman said that was for the GST and PST due on the single print that was to be retained by the purchaser.

**39**   The Purchase Agreement also appointed the Appellant as escrow agent for both the vendor and purchaser. As escrow agent the Appellant was required to pay the expenses of the proposed transaction and to hold the payment for the prints until the transfer of the ownership of the prints to the purchaser was confirmed and two bona fide appraisals of the prints valuing each group of prints at not less than $10,000 had been received.

**40**   The Purchase Agreement was executed by Grossman on behalf of Coleman, and for the latter half of 2000 on behalf of Silver. Grossman and Sloan both testified that Sloan had given Grossman the authority to sign the agreements on behalf of the vendor companies.

**41**   Under the Agency Agreement the purchaser appointed the Appellant as its agent for the purpose of

acquiring prints from one or more dealers. The purchaser acknowledged and agreed that the Appellant and all its sub-agents would seek a commission and a fee from the dealers of the prints. The Appellant also agreed "to seek one or more charities, or other institution qualified under the *Income Tax Act* to give donation receipts, and obtain agreement from such charities and or institutions to accept donations and issue charitable receipts satisfactory to the Purchaser."

**42**    Under the Deed of Gift the purchaser transferred the prints to a charity chosen from a list supplied by the Appellant. Grossman had previously confirmed with those charities that they would accept gifts of prints arranged by the Appellant. The Deed of Gift also authorized the Appellant to take all steps necessary to complete the transfer.

**43**    The charity was required by the terms of the donation to hold the works for at least ten years. This was done in order to circumvent the requirement that a charity disburse 80% of any donation within one year of receiving the donation. An exception to that rule allows charities to build endowment funds, so that where a gift is directed to be held for a minimum ten year period the charity is exempted from the normal rule and is required to disburse only 4% of the gift in the following year.

**44**    The Appellant sent the Deeds of Gift to the respective charities along with a letter setting out the value of the prints and requesting that the charities acknowledge the gift and forward a charitable receipt to the Appellant. The Appellant had arranged with the charities that it would hold on to the receipts until it received the written appraisals confirming the value of the prints and then send them to the purchasers.

**45**    The funds received from the purchasers were generally put into a trust account set up by the Appellant, although a few cheques were deposited to other accounts in the Appellant's name. Once payment was received from a purchaser, Grossman said that the Appellant's office staff confirmed the order with Sloan by telephone to ensure he had sufficient stock of the prints that were selected.

**46**    Upon confirmation of the order, the Appellant considered that the terms of the escrow clause in the Purchase Agreement had been met, that the purchase was complete and that the Appellant was free to send 50% of the proceeds to the vendor and keep the balance for itself. The Appellant kept the interest on term deposits made with money in this account.

**47**    Both Grossman and Pearlman said that they felt that the escrow condition that required two bona fide appraisals was met when they had received two verbal valuations of the prints from the appraisers. They said that they expected that the verbal valuations would be confirmed in writing.

**48**    The Appellant offered discounts on purchases made early in the year, and to some purchasers on large sales. Pearlman and Grossman said that in some cases they got Sloan's agreement to split the discount with him and in other cases they absorbed the entire discount out of their commission. Artistic accepted promissory notes in payment for the prints from some purchasers. Grossman said that Sloan was aware that Artistic accepted the promissory notes and shared the risk of non-payment of the notes. Sloan said that he never agreed to accept the risk on the promissory notes.

**49**    After year end, the vendor shipped the prints to Artistic's office, where they were inspected, sorted, repackaged and then shipped to the charities, or in the case of the eleventh print, to the purchasers. The Appellant paid the cost of these activities.

**50**    Once the written appraisals were received, the Appellant forwarded a copy to the charities. A copy was also sent to the purchasers along with their charitable receipts.

**51**    Transfers of funds to Sloan's companies were made at various intervals starting November 20, 1998. After the calendar year end Grossman sent Sloan an accounting showing the number of units sold

and any adjustments that reduced the amount due to the vendors. The statement that Grossman sent contained little detail other than an aggregate of sales and adjustments to be made to the vendors' share of the proceeds. The adjustments included items Sloan had agreed to pay or share with the Appellant (such as appraisals, sales discounts, sales taxes, brokerage fees and legal fees and contributions to a legal defence fund for the purchasers.)

52    Artistic's operations were largely the same in each year. The appraisers worked on continuous stream of prints that were received throughout the year and gave verbal assurances of value, followed by written appraisals after the calendar year end. Finks was replaced by another appraiser in 1999.

53    Grossman testified that each year Artistic added new charities that would accept donations. At some point, Artistic began paying the charities a fee that was said to be intended to help them defray storage and insurance costs brought about by the ten year holding period for the donations. The fee ranged between $1,000 and $4,000 per million dollars of donations accepted. Grossman said that he probably asked Sloan to pay but he refused. Sloan said he was unaware of payments.

54    Artistic in certain cases arranged for purchasers to donate the eleventh print they received, thereby increasing their charitable donation tax credit. Artistic did not charge the purchasers for this extra service.

55    Over the period that the tax shelter was operated, the Appellant earned commissions of $10,588,970. According to Sloan approximately fifty thousand prints were sold.

56    In the Appellant's financial statements filed with its income tax returns for its taxation years ending January 31, 1999 and January 31, 2000 it originally reported its income on the basis that it was the vendor of the prints, by showing its revenue was from gross sales and deducting an amount for the cost of goods sold. After the GST audit began in 2000, and the CRA auditor showed Pearlman the returns, Pearlman told the auditor that the financial statements and returns were wrong and that the Appellant's income consisted of commissions received from Sloan's companies and not proceeds from the sale of the prints. Amended financial statements were prepared and amended tax returns were filed even though the error did not ultimately affect taxable income. According to the pleadings of the Respondent, the Minister accepted that the Appellant was not the vendor of the prints.

57    Grossman, who signed the original returns, said that he did not read the financial statements attached to the returns, and relied on the accountant who prepared them. He said that the financial statements were prepared from information given to the accountant by the Appellant's bookkeeper, who mistakenly set up the Appellant's accounting records on the basis that the Appellant was the vendor of the prints. The accountant, Dan Kowalchuk, confirmed that he prepared the financial statements and returns on the basis of the working papers provided to him by the bookkeeper. Grossman said that they had never looked at the records for the Appellant kept by the bookkeeper because he kept his own tracking sheets for the sales.

Appellant's arguments

58    Counsel stated that all of the evidence showed that Sloan wanted to market his art in Canada under an art donation program and that Artistic agreed to act as his agent to set up the program and to sell the art. Sloan's companies were the vendors of the art, as admitted by the Respondent, and they paid a commission on the sale to Artistic. Those commissions were received for services that were zero rated supplies pursuant to section 5 of Schedule VI of Part V of the *Act*, which reads:

> [Agent's or representative's service] -- A supply made to a non-resident person of a
> service of acting as an agent of the person or of arranging for, procuring or soliciting

orders for supplies by or to the person, where the service is in respect of

    (a)    a supply to the person that is included in any other section of this Part; or

    (b)    a supply made outside Canada by or to the person.

**59**    Counsel said that it was open to the Appellant and US vendors to structure their affairs in such a way as to minimize the amount of tax payable and that tax consequences must be based on the legal character of the relationships as structured, regardless of their economic or commercial substance and the absence of any non-tax purpose for their existence.

**60**    The Appellant's counsel submitted that the commissions earned by the Appellant in this case were consideration for acting as the vendors' agent pursuant to an oral agreement between Sloan on behalf of the US vendors and Grossman and Pearlman on behalf of the Appellant. Counsel said that there was no requirement that the Agency Agreement be put in writing and that the documentary evidence as well as the testimony of Grossman, Pearlman, Sloan and Turner proved the oral agreement was a valid, bona fide agreement and its terms were followed by the parties.

**61**    The purchase price for the prints was paid by the purchaser to the Appellant as escrow agent, but belonged to the vendor once the escrow conditions were fulfilled. At that point the vendor could use the money to pay the Appellant its commission. Pursuant to the oral Agency Agreement with Sloan, the Appellant took its commission from the funds and the payment of the commissions was corroborated by year end statements provided to Sloan showing the amount of sales made and the amount of fees paid to the Appellant. Counsel said that it was irrelevant that the Appellant mistakenly filed its returns on the basis that it was the vendor of the prints, since the Minister in these proceedings had accepted that Sloan's companies were the vendors.

**62**    Counsel referred to the provision in the Agency Agreement which stated that the Appellant would seek its commission or fee from the dealers from whom the prints were acquired, and said that the Respondent had not met the onus on it to show that that provision was a sham. In addition, he said that the Respondent had neither pleaded nor proved that the agreement between the purchasers and the vendors which set the purchase price of the prints at $3,500 was a sham.

**63**    In the absence of any proof that the agreement to pay $3,500 for the prints to the US vendors was a sham, there is no basis for finding that any of the consideration paid by the purchaser's was paid for services provided by the Appellant. There was nothing in any of the documentation or any of the testimony of the witnesses that indicates that the purchaser paid or agreed to pay any fee or commission. On the contrary, the purchaser acknowledged that any commission that was paid would be paid by the dealer.

**64**    Counsel also said that the vast majority of the work performed by the Appellant to market the art for sale was carried out prior to any purchaser being identified, such as getting verbal valuations from the appraisers and lining up the charities to accept the donations. This work was necessary to create a market for the artwork so that it could be sold in large quantities. After the sale of the prints, some services were performed by the Appellant for the benefit of the purchasers or charities, but these were minimal and no fees were charged for those services. Furthermore, the benefit of those services to the purchasers was incidental to the main benefit accruing to the vendors, ensuring ongoing sales of prints.

**65**    Counsel referred to the evidence of Grossman that, in his view, less than 5% of the services which the Appellant rendered were for the benefit of the purchasers. Overall, counsel said that any services that benefited the purchasers or charities were subservient or incidental to the services supplied by the Appellant to the US vendors for the sale of the art and paid for by the vendors and that section 138 of the *Act* would therefore apply to deem the supply of any services to the purchasers to be part of the service

supplied to the US vendors. Section 138 reads:

**Incidental supplies** --For the purposes of this Part, where

(a) a particular property or service is supplied together with any other property or service for a single consideration, and

(b) it may reasonably be regarded that the provision of the other property or service is incidental to the provision of the particular property or service,

the other property or service shall be deemed to form part of the particular property or service so supplied.

66   The Appellant's counsel said that if it is determined the purchasers paid commissions to the Appellant, the consideration should be allocated pursuant to subsection 153(2) of the *Act* which deals with consideration paid for multiple supplies. On the basis of Grossman's testimony, only 5% of the services provided by the Appellant were for the benefit of the purchasers and therefore only 5% of the commissions should be attributed to those services. Subsection 153(2) reads:

**Combined consideration** -- For the purposes of this Part, where

(a) consideration is paid for a supply and other consideration is paid for one or more other supplies or matters, and

(b) the consideration for one of the supplies or matters exceeds the consideration that would be reasonable if the other supply were not made or the other matter were not provided,

the consideration for each of the supplies and matters shall be deemed to be that part of the total of all amounts, each of which is consideration for one of those supplies or matters, that may reasonably be attributed to each of those supplies and matters.

67   The Appellant's counsel said that if it is determined the purchasers paid commissions to the Appellant, the GST was included in the commissions that were paid according to the Purchase Agreement. Therefore, if it is found that any portion of the fee was subject to GST because the purchaser was really paying a fee to the Appellant, that fee would have to be deemed to be inclusive of GST. The Minister's calculation failed to take this into account.

68   Counsel said that if it is found that the Appellant failed to collect GST, the penalties should be reversed on the grounds that the Appellant acted reasonably and with due diligence to structure its affairs in accordance with legal advice.

Position of the Respondent

69   The Respondent says that all of the commissions earned by the Appellant from its operations in the period in issue were paid to it by the purchasers for services performed for them. Those services included assisting with purchase of the prints, making the prints available in Canada, arranging for appraisals of the prints and finding charities that would accept them. The services were provided in Canada to persons resident in Canada and therefore they were taxable supplies on which the Appellant was required to collect GST under subsection 165(1) of the *Act*. That provision read at the time:

**Imposition of goods and services tax** -- Subject to this Part, every recipient of a taxable supply made in Canada shall pay to Her Majesty in right of Canada tax in

respect of the supply calculated at the rate of 7% on the value of the consideration for the supply.

**70**   The Respondent said that that the provision of the Agency Agreement that provided that the Appellant would seek its commission from the vendors of the prints, and the provision of the Purchase Agreement that the purchase price of the prints was $3,500 were both shams.

**71**   Counsel for the Respondent said that:

> Despite the documentation, the $3500 is paid by the donor, the purchaser, and it is split, and half of that represented Artistic's consideration from the donor for the services that it provided and the other half represented the portion that went to Sloan for the artwork.
>
> What was really going on was that A was taking its consideration from the funds paid by the donors, because the donors were paying $3500 for art plus services, and that what they were really buying, is a tax receipt through an art donation program.[5]

**72**   In essence, the Appellant earned 50% of amount paid by the purchasers which "represented its fee that it received from the donors for operation an art donation program."

**73**   Counsel said that the Appellant did not follow the agreements in a number of respects: for example, he said that the Appellant treated the purchase price as its own rather than as funds held in trust. It released funds to the vendors and took money for itself from the purchase funds before two written appraisals were provided for the prints.

**74**   Counsel submitted that the evidence showed that Artistic set up the tax shelter infrastructure to serve the purchasers of the prints, and that Artistic did a substantial amount of work for the purchasers to facilitate the acquisition and donation of the prints. It received, inspected, repackaged and shipped the prints, and obtained acknowledgement of donations and receipts from charities and forwarded the receipts to the purchasers. In some cases it arranged the donation of the eleventh print. It was not credible, he said, that Artistic provided these services to the purchasers for free.

**75**   Nor was it credible that most of the work in arranging for the donations was done before the purchasers bought the prints or that this work was done for the vendors. He referred to the evidence that showed that Grossman continued to sign up new charities to accept donations throughout the years the shelter operated, and pointed out that Artistic was obligated to do this work for the purchasers pursuant to the Agency Agreement. Despite what Grossman said in cross-examination, this work was not done for Sloan. Counsel said that:

> This was Artistic's art donation program and the only role that Coleman and Silver played was to source the artwork, that the whole purpose of this was to create charitable tax receipt, which is what Artistic was facilitating. There is no reason to for Sloan to be paying a commission when Artistic needed Sloan's artwork for the art donation program Artistic was operating and that it had created.[6]

**76**   Counsel for the Respondent also submitted that the Appellant did not act as Coleman's and Silver's agent and there was no agreement by which Coleman and Silver agreed to do so or to pay a commission to Artistic. Counsel said that the Court should reject Sloan's, Grossman's and Pearlman's evidence that an oral Agency Agreement existed between the parties, because they were not credible. Counsel pointed out a number of inconsistencies in their evidence and, in the case of Pearlman, inconsistencies between his evidence given at his examination for discovery and at the hearing.

77    Counsel says that the Appellant has failed to show a bona fide legal relationship of agency existed between Coleman and Silver and Artistic. Even if the Court accepts that there was an agreement between Artistic and Coleman and Silver, the Court should find that it did not create an agent-principal relationship between them because their conduct was not consistent with such a relationship. The labels that the parties use to describe their relationship are not determinative.

78    Counsel said that the essential ingredients of an agency relationship are:

    (i)   the consent of both the principal and the agent,

    (ii)  authority given to the agent by the principal, allowing the former to affect the latter's legal position, and

    (iii) the principal's control of the agent's actions.[7]

79    According to counsel, significant factors in determining whether an agency relationship exists are the risk assumed by the parties and whether there was any obligation on the alleged agent to account for moneys received. He pointed out that in this case that Artistic assumed risk for a part of the purchase price of the prints that was paid by promissory notes by some of the purchasers. He said that if Artistic was acting on behalf of Sloan's companies, one would expect the principal to carry the risk.

80    Counsel also said that it did not appear that Sloan or his companies exercised control over Artistic in a manner that would indicate that the latter was acting as agent. Counsel said that there was minimal financial accounting made to Sloan, that Sloan was not familiar with the purchase agreement documents that were supposedly signed on his companies' behalf and he said that he did not receive copies of Purchase Agreements. Sloan was also unaware that Artistic was making payments to charities to help defray the cost of storage and insurance. Counsel said that one would expect Sloan to be more rigorous about what his supposed agents were doing on his behalf and about the accounting for profits.

81    Counsel asked the Court to find that Sloan never intended to create any legal relationship with the Appellant other than to supply prints for the latter's art tax shelter. He said that Sloan and his companies functioned as an accommodator for the Appellant, and let the Appellant determine all aspects of the relationship, including the price of the prints.

82    With respect to the calculation of the amount of GST due, counsel said that the reference to GST being included in the sale price would not be determinative, because the payment by the purchasers to the Appellant was a commission and not part of the sale price of the prints.

83    Counsel for the Respondent submitted that if the Appellant was found to have received consideration from the purchasers for supplies and services made to them, though supplies could not be considered incidental supplies for the purpose of the rule in section 138 of the *Act*. Counsel said that the incidental supply rule only applies to two separate supplies made by the same party, and not to separate supplies made by different parties. In support of this proposition counsel referred to the decision of Lamarre Proulx, J. in *Association Recreative Les Jardins du Château Inc.*, [1994] G.S.T.C. 32.

84    Even if it were possible to apply the rule to supplies made by two different parties, counsel said that the services Artistic was providing were not simply incidental to the supply of the prints as contended by the Appellant. He said that the whole reason for the donation programs existence was the tax receipt and that the services arranging to obtain a tax receipt were not secondary to the purchase of the art.

85    With respect to any apportionment of the consideration, counsel said that the evidence showed that the services provided to the purchasers far exceeded 5% of the overall services provided by Artistic.

**86**   Finally counsel for the Respondent said that if the written agreements between the purchasers and Artistic are found to be shams, and if Artistic is found not to be the agent for Sloan's companies, the subsection 280(1) penalties should be maintained since the Appellant did not show that it took all reasonable steps to ensure that it complied with the *Act*.

Analysis

**87**   Subsection 165(1) of the Act, as it read at the time, requires that GST be charged on the provision of a taxable supply at a rate of 7% of the value of the consideration given for the supply. That provision read:

> **Imposition of goods and services tax** -- Subject to this Part, every recipient of a taxable supply made in Canada shall pay to Her Majesty in right of Canada tax in respect of the supply calculated at the rate of 7% on the value of the consideration for the supply. ,

**88**   The Respondent in this case maintains that the Appellant received commissions or fees of $10,588,970 from the purchasers of the prints as consideration for services the Appellant supplied to the purchasers in Canada.

**89**   The Appellant maintains that it did not charge any commissions to the purchasers, that it received its commissions from the US vendors and that any services performed for the purchasers were done for no charge.

**90**   It is clear from the evidence that the Appellant did provide services to the purchasers, including locating and arranging for the purchase of the prints, identifying charities to accept donation of the prints, and inspecting and delivering the prints to the charities and to the purchasers.

**91**   These were services that the Appellant had agreed to provide to the purchasers under the Agency Agreement and, in my view, the fact that some or most of the arrangements required of the Appellant had already been put in place prior to the signing of the Agency Agreement does not mean that the services were not provided to the purchasers. The services were performed in anticipation of the signing of the Agency Agreement and the purchasers received the benefit of those services.

**92**   However, it is also clear from the evidence that the purchasers did not agree to pay anything to the Appellant for those services. The Agency Agreement expressly required the Appellant to look to the dealers from which the prints were acquired for any commission. There is no ambiguity in the wording of the Agency Agreement in this respect.

**93**   The Respondent contends that this provision in the Agency Agreement is a sham. This position was advanced for the first time in the Reply to Notice of Appeal, as an additional fact the Respondent was relying on in the appeal. Therefore, the Respondent has the onus of proving sham here.

**94**   In order to constitute a sham, there must be a common intention that the rights and obligations created by the documentary evidence are different from the actual rights and obligations contemplated by the parties to the transaction. As Lord Diplock said in *Snook v. London & West Riding Investments Ltd.*, [1967] 1 All E.R. 518 at 528.

> I apprehend that, if it has any meaning in law, it means acts done or documents executed by the parties to the "sham" which are intended by them to give to third parties or to the court the appearance of creating between the parties legal rights and

obligations different from the actual legal rights and obligations (if any) which the parties intend to create. One thing I think, however, is clear in legal principle, morality and the authorities...that for acts or documents to be a "sham", with whatever legal consequences follow from this, all the parties thereto must have a common intention that the acts or documents are not to create the legal rights and obligations which they give the appearance of creating. No unexpressed intentions of a "shammer" affect the rights of a party whom he deceived.

95    In this case, there is no evidence of a common intention that the rights and obligations in the Agency Agreement were different than those contemplated by the parties. None of the purchasers were called as witnesses and Grossman and Pearlman both said that the Appellant did not charge the purchasers any fee or commission.

96    Rather, the Respondent asks the Court to infer that the purchasers must have agreed to pay a fee or commission to the Appellant because of the extent of the services that the Appellant provided to them. The Respondent says that it is not credible that those services were provided for free.

97    The Respondent also says that the evidence shows that the Appellant did not treat the funds it received from the purchasers as funds held in trust for the vendors and took the commissions from the purchasers funds before the escrow conditions relating to the appraisals were met, and that this is a further indication that the Appellant did not intend to be bound by the agreements.

98    I do not believe it is necessary to determine whether the Appellant breached any escrow terms of the Agency Agreement because there was no evidence which led to show that the purchasers were ever aware of the alleged breaches or that they consented to the Appellant's conduct. More importantly to the Respondent's sham argument, the evidence did not show that the purchasers did not intend to bind the Appellant to the escrow conditions when they entered into the agreements. At most, the evidence shows that the Appellant did not carry out certain of its escrow obligations in accordance with the agreement, but that this did not affect its overall performance under that agreement and the Purchase Agreement, and no purchaser took issue with the performance in itself. The fact that the purchasers did not take issue with the allege failure of the Appellant regarding the escrow condition cannot be construed as an indication of a sham.

99    With respect to the Respondent's point that the Appellant provided extensive services to the purchasers, I am not aware of any requirement that the Appellant charge for those services. Furthermore the services were provided in the context of the overall tax shelter operations in order to ensure the ongoing sale of prints from which the Appellant benefited. It was apparent that these arrangements were extremely lucrative for the Appellant, and that it could well absorb the relatively minor cost of the services provided to the purchasers.

100    In order to show that the purchasers paid fees on commission to the Appellant, the Respondent would have also been required to prove that the purchase price set out in the Purchase Agreement and order forms signed by the purchasers was also a sham. Under that agreement the purchasers agreed to pay $3,500 per set of prints to the US vendors. As I noted above, none of the purchasers were called to testify, and I cannot infer from the remaining evidence that they did not intend to be bound by that agreement, or that the deal to purchase the prints was other than what was contained in the agreement. No provision in those agreements was made for the payment of a commission to Artistic by the purchasers. I conclude that it was not the intention of the purchasers to pay any commission to the Appellant for its services.

101    For all of these reasons, I find that the Respondent has not succeeded in showing that the agreements entered into by the purchasers or any part of them were shams. Therefore there is no basis

on which to find that the commissions received by the Appellant were paid by the purchasers. The transactions entered into by the purchasers with the US vendors and with the Appellant must be accepted as they are found in the Purchase and Agency Agreements. As stated by the Supreme Court of Canada in *Shell Canada Ltd. v. The Queen*[8]:

> ... absent a specific provision of the Act to the contrary or a finding that they are a sham, the taxpayer's legal relationships must be respected in tax cases. Recharacterization is only permissible if the label attached by the taxpayer to the particular transaction does not properly reflect its actual legal effect.

**102**    I also accept the evidence of Pearlman, Grossman and Sloan that the US vendors agreed to pay a commission to the Appellant for acting as their agent in the sale of the prints. This evidence was corroborated by the testimony of Turner, a disinterested witness, whose testimony was not challenged in cross-examination. Turner provided advice on the structuring of the relationship between Artistic and the US vendors to minimize tax, and that advice appears to have been acted on by the parties.

**103**    I disagree with the Respondent that the Appellant's conduct was inconsistent with an agency relationship between it and the vendors of the prints. There was evidence of consent by the vendors to the Appellant acting as its agent and evidence that the vendors granted the necessary authority to the Appellant to bind it under the Purchase Agreements. The risk under those agreements was on the vendors rather than on the Appellant which is also consistent with an agency relationship. Only in a few cases did the Appellant take on some risk regarding payment, but this was insignificant in the context of the overall number of prints sold. The Appellant did account to the vendors for the proceeds from the sales and for the vendors' portion of certain shared expenses. It is true that the accounting was rather rudimentary, but it met the requirements of the parties in the circumstances. Sloan said that he was aware of roughly how much was due to the vendors at any point because he kept close track of the number of prints shipped, and had regular discussions with Grossman about the expenses incurred. Overall, the relationship between the Appellant and the US vendors meets the generally accepted definition of "agency" set out by Fridman in *The Law of Agency* ( 7th ed.) at page 11 :

> Agency is the relationship that exists between two persons when one, called the *agent*, is considered in law to represent the other, called the *principal*, in such a way as to be able to affect the principal's legal position in respect of strangers to the relationship by the making of contracts or the disposition of property.

**105**    In light of my conclusions above, the only issue that remains to be addressed is the Appellant's liability for the subsection 280(1) penalty in respect of the disallowed input tax credits. After the concession made by the Respondent noted at the beginning of these reasons, there remains the disallowed input tax credits of $92,480.93 for the periods in issue. Although Artistic stated that it was challenging the penalty on the remaining amount, no evidence was led to show that it exercised due diligence in reporting its input tax credits and no argument on the point was presented. Therefore I find that there is no basis for deleting the penalty in this case.

**106**    For all of these reasons the appeal is allowed in part, with costs and the assessment is referred back to the Minister for reconsideration and reassessment on the basis that the Appellant was not required to collect GST on the commissions it received during the period under appeal and on the basis of the concessions set out in paragraphs 4 and 5 of these reasons.

PARIS T.C.J.

cp/e/qlaim/qlmrz/qlhcs/qlaxw/qlhcs/qlaxw

1 The arrangements did not technically meet the definition of "tax shelter" in subsection 237.1(1) of the *Income Tax Act* as it then read because the claims made by purchasers were for tax credits rather than for deductions or losses. The definition was amended effective February 18, 2003 to cover arrangements involving claims for tax credits.

2 The ITCs are to be allowed as follows:

> For the period ending January 31, 1999-$16,016.70. For the period ending January 31, 2000-$22,917.69. For the period ending January 31, 2001-$13,184.57.

3 The GST relates to the following periods :

> Period ending January 31, 1999 $23,941.32. Period ending January 31, 2000 $56,574.86. Period ending January 31, 2001 $30,246.68.

4 Transcript of proceedings, p. 11.

5 Transcript of proceedings, p. 920.

6 Transcript of Proceedings, p. 995.

7 (*Royal Securities Corp. v. Montreal Trust Co.* (1966), 59 D.L.R. (2nd) 666 (Ont. H.C.) at p. 684).

8 [1999] 3 S.C.R. 622 at paragraph 39.

C

**THIS IS EXHIBIT "C"**
**referred to in the affidavit of**
**Laura Alescio**
This $\underline{30^{th}}$ day of September, 2011

_____

**Commissioner for Taking Affidavits**

**MFeltman**

MHFeltman Verbatim Reporting

1       TAX COURT OF CANADA

2            IN RE:   The Income Tax Act

3    BETWEEN:                        2002-4824(IT)G

4                **JEFFREY SACKMAN**

5                                 Appellant

6                    – and –

7

8            **HER MAJESTY THE QUEEN**

9                                 Respondent

10

11

12   This is the Examination for Discovery of **JEFFREY SACKMAN**,

13   the Appellant herein, held at the Offices of the Department

14   of Justice, 2 First Canadian Place, Exchange Tower, Suite

15   3400, Toronto, Ontario, on Monday, December 11, 2006.

16

17   APPEARANCES:

18   Martin Teplitsky, Q.C.              for the Appellant

19   Perry Derksen, Esq.)              for the Respondent

20   Jenna Clark          )

21

22

23               MHFeltman Verbatim Reporting

24       375 Merton Street, #302   Toronto, Ontario  M4S 1B4

25               Per:  Holly Feltman, C.V.R.

MHFeltman Verbatim Reporting

39

Jeffrey Sackman

1  A. Do I have a practice? I sign an awful
2  lot of things in my professional life. I don't know that
3  it matters if it's dated a day before and I sign it on the
4  next day.

5  134.  Q. What was your understanding as to the
6  purpose of entering into this agency agreement at Tab 70?

7  A. It's self-explanatory.

8  MR. TEPLITSKY: The agreement speaks for
9  itself.

10  135.  BY MR. DERKSEN: Q. I'm not asking what
11  the agreement says, I'm asking what Mr. Sackman's
12  understanding is as to why he was entering into the
13  agreement.

14  A. To agree with what's written. I mean,
15  I don't understand that question.

16  136.  Q. So you understood that you were
17  appointing Artistic Ideas as your agent for the purposes of
18  acquiring prints.

19  A. That's what it says.

20  137.  Q. And you understood you were appointing
21  Artistic Ideas as your agent for the purposes of carrying
22  out donations of those prints to charities in return for
23  charitable donation receipts.

24  A. Correct.

25  138.  Q. Is there any issue about the

**D**

**THIS IS EXHIBIT "D"**
**referred to in the affidavit of**
**Laura Alescio**
This 30ᵗʰ day of September, 2011

**Commissioner for Taking Affidavits**

MHFeltman

MHFeltman Verbatim Reporting

TAX COURT OF CANADA

IN RE:   The Income Tax Act

BETWEEN:                                        2002-4824(IT)G

**JEFFREY SACKMAN**

Appellant

– and –

**HER MAJESTY THE QUEEN**

Respondent

This is the Examination for Discovery of **JEFFREY SACKMAN**,

the Appellant herein, held at the Offices of the Department

of Justice, 2 First Canadian Place, Exchange Tower, Suite

3400, Toronto, Ontario, on Monday, December 11, 2006.

<u>APPEARANCES:</u>

Martin Teplitsky, Q.C.                      for the Appellant

Perry Derksen, Esq.)                        for the Respondent

Jenna Clark           )

MHFeltman Verbatim Reporting

375 Merton Street, #302   Toronto, Ontario   M4S 1B4

Per:   Holly Feltman, C.V.R.

MHFeltman Verbatim Reporting

42

Jeffrey Sackman

1          MR. DERKSEN:  If I said Artistic Ideas, I

2     apologize.

3          MR. TEPLITSKY:  And that's 1998, but, yes,

4     it is his signature, even though I don't consider it

5     relevant, and his signature appears at Tabs 67, 68, and 69.

6     148.          BY MR. DERKSEN:  Q.  So you agree that

7     each of these documents at Tabs 66, 67, 68, and 69 are

8     copies of the purchase agreements that you entered into

9     with respect to your purchases of the art.

10         MR. TEPLITSKY:  Yes.

11    149.          BY MR. DERKSEN:  Q.  In the first three

12    instances, I take it, you understood you were purchasing

13    art from Coleman Fine Arts, and then in the latter

14    agreement in November of 2000, you understood you were

15    purchasing art from Silver Fine Arts.

16         A.  It appears, yes.

17    150.          Q.  Do you know why there was a change

18    between Coleman and Silver?

19         A.  No.

20    151.          Q.  Did you have any understanding of who

21    Coleman Fine Arts Ltd. was?

22         A.  No.

23    152.          Q.  Were you ever told who the principals

24    of Coleman Fine Arts were?

25         A.  No.

E

**THIS IS EXHIBIT "E"**
referred to in the affidavit of
**Laura Alescio**
This $\underline{30^{th}}$ day of September, 2011

_____

**Commissioner for Taking Affidavits**

MHFeltman Verbatim Reporting

1          TAX COURT OF CANADA

2          IN RE:  The Income Tax Act

3     BETWEEN:                           2002-4824(IT)G

4                 **JEFFREY SACKMAN**

5                                        Appellant

6                      - and —

7

8              **HER MAJESTY THE QUEEN**

9                                        Respondent

10

11    This is the Examination for Discovery of **JEFFREY SACKMAN,**

12    the Appellant herein, held at the Offices of the Department

13    of Justice, 2 First Canadian Place, Exchange Tower, Suite

14    3400, Toronto, Ontario, on Monday, January 15, 2007.

15                      **VOLUME II**

16

17    APPEARANCES:

18    Martin Teplitsky, Q.C.              for the Appellant

19    Perry Derksen, Esq.)                for the Respondent

20    Jenna Clark            )

21

22

23              MHFeltman Verbatim Reporting

24       375 Merton Street, #302   Toronto, Ontario   M4S 1B4

25              Per:   Holly Feltman, C.V.R.

1   the Crown copies of the working papers of the experts?

2                    MR. TEPLITSKY:  I'll give you the report.

3                    MR. DERKSEN:  I'm asking for their working

4   papers, their working file.

5   **REF 125**        MR. TEPLITSKY:  No, but if you have a case

6   which says that that's producible, send it over to me, if

7   you don't mind, and I'll be prepared to change my view.

8   It's still covered, I would have thought, by litigation

9   privilege.  The Rules provide for production of the report.

10  But I may be wrong, you might have a case.

11                   MR. DERKSEN:  Let's take a few minutes.

12  --- RECESS

13                   MR. DERKSEN:  I'm going to pass over to

14  you, Mr. Sackman, what I now understand is a copy of the

15  binder that Mr. Teplitsky produced to us on, I believe it

16  was, December 7, and just so that we know what we're

17  talking about, let's identify it as Exhibit 7.

18                   MR. TEPLITSKY:  That's fine.

19                   MR. DERKSEN:  So binder received from Mr.

20  Teplitsky on December 7, 2006.

21  EXHIBIT 7:  Appellant's sales receipts binder.

22                   MR. TEPLITSKY:  This stuff at the front I

23  don't think is something I gave you, is it?

24                   MS. CLARK:  It's an exact photocopy of the

25  binder you provided to us.

ꟼ𝖬𝖥𝖤𝖫𝖳

MHFeltman Verbatim Reporting                                    Jeffrey Sackman

1              MR. TEPLITSKY:  It starts really here,

2    appraisals in support, all right, yes.

3    596.           BY MR. DERKSEN:  Q.  Just so I understand,

4    Mr. Sackman, what this is, can you explain to me how this

5    binder has been set up and the relevance of these documents

6    to your appeal and the issues raised in the appeal?

7              MR. TEPLITSKY:  Do you want me to answer

8    that?  He won't be able to, it's my work.

9              MR. DERKSEN:  All right, if your client

10   can't answer it, I'm used to you answering these types of

11   questions.

12             MR. TEPLITSKY:  I don't want to do it,

13   since you seem to object to it, but this is part of my work

14   product in the litigation which I have disclosed to you.

15             MR. DERKSEN:  Go ahead, feel free.

16             MR. TEPLITSKY:  Central to the Appellant's

17   case is that there is a retail market for the art which he

18   donated and that the assessment should be based on the

19   retail fair market value, that is the highest price that a

20   purchaser would pay for these goods, not on some other

21   different market.  So, accordingly, I asked Ms. Yeomans to

22   collect for me on an ongoing basis, on an ongoing project,

23   invoices that would reflect the fair market value of and

24   that there is a retail market and/or a wholesale market

25   where the price is higher than the assessed value or

MHFeltman Verbatim Reporting                                    Jeffrey Sackman

1    appraised values for the claim.

2               This book was organized by artist with

3    examples of invoices that she's been able to find.  Now,

4    obviously, it isn't easy to get some of these invoices, but

5    that is what has been collected thus far and that is an

6    ongoing project by Ms. Yeomans and by Mr. Rosoff, to find

7    examples, supporting examples of sales of art from these

8    artists, some of which are exactly the ones that were

9    donated, at values that are supportive of the appraisers'

10   assessment.  So that's how it was organized at my request.

11   597.            BY MR. DERKSEN:  Q.  So you have said that

12   Edith Yeomans was involved in assembling this binder.

13               MR. TEPLITSKY:  She was, at my request,

14   involved in obtaining the documents.  Putting together the

15   binder, I'm responsible for that.  This is not a work of

16   art, it's just a way of organizing many of the pieces.

17   When she does her final report, these will be put forward

18   by her, I hope, in a way that is prettier.  So this is my

19   work, this is not her work.  Obtaining the invoices was her

20   work, putting together the book in this form, and this is

21   not a final form, it was just a lot, I thought, easier for

22   you than dumping on you another slew of sales invoices.

23   598.            BY MR. DERKSEN:  Q.  You mention also that

24   Charles Rosoff was involved in obtaining some of these

25   documents.

MHFeltman Verbatim Reporting                                    Jeffrey Sackman

1              MR. TEPLITSKY:  I'm not sure which ones he

2    obtained.  She has been the principal person doing it.

3    599.           BY MR. DERKSEN:  Q.  Is it possible for

4    you to identify which came from Yeomans and which came from

5    Rosoff?

6              MR. TEPLITSKY:  No, I can't.  I know that

7    I have asked him to do it as well and he may have made some

8    of the introductions for her in order to get it, but it's

9    hard to get.  And, of course, there are sales occurring on

10   the Web which we can't get the invoices for and what have

11   you.

12   600.           BY MR. DERKSEN:  Q.  Is this material

13   material that was accumulated — I appreciate that — maybe

14   you can confirm this for me.  There appear to be extracts

15   from Yeomans's appraisal reports.

16             MR. TEPLITSKY:  Yes.

17   601.           BY MR. DERKSEN:  Q.  So that aside, is the

18   material contained within the binder material that was

19   obtained after the appraisals were prepared and issued to

20   Artistic Ideas as part of the art donation program back in

21   2000 and 2001?

22             MR. TEPLITSKY:  Some of this, perhaps most

23   of it, contains information which she had orally.  In other

24   words, she would call around to galleries, she did whatever

25   appraisers do to attempt to verify their conclusion as to

MHFeltman Verbatim Reporting                                   Jeffrey Sackman

1   value.  When I was retained, I said to her and to Rosoff

2   that I felt we needed to make an effort to get documents to

3   corroborate what people were saying to her and she said

4   this was difficult to do and I said it's essential to our

5   case that we show that there is a retail market for these

6   goods that is corroborative of the value opinion that you

7   have reached.  So with those marching instructions, she

8   produced an earlier bundle which I sent to you and then the

9   diagram was produced, which is not in here, about how

10  values are augmented in the art market, and then there was

11  another big bundle.  I said now I'd better put them in some

12  form of organization for you, but this is not going to be

13  its final form.  So this was really done just to

14  convenience you in terms of seeing what we have obtained

15  thus far.  It is not more than that.

16  602.          BY MR. DERKSEN:  Q.  Is there any way to

17  determine what Yeomans had before the litigation and after

18  the litigation?

19            MR. TEPLITSKY:  I know from talking with

20  her and from reading her report, but also from speaking

21  with her, that basically she did research into each of

22  these artists and did research into the market, but I think

23  it was mainly based on oral.  So I don't want to swear that

24  she didn't have any of these pieces of paper, I doubt that

25  she had at the time, but she had the information in them.

МН¢ТЧ

MHFeltman Verbatim Reporting                                    Jeffrey Sackman

1    She would have called a gallery and said, "Are you selling

2    this and what do you get for it?" and they would have told

3    her.  I said, "I want to see the piece of paper."

4    603.              BY MR. DERKSEN:  Q.  If Mr. Sackman would

5    produce Yeomans's working paper files we could figure that

6    out.

7                     MR. TEPLITSKY:  I don't see the relevance

8    of figuring it out exactly for the reasons I previously

9    gave.  You have not accepted her appraisal reports, period,

10   so we're going to do an expert's report from her that we're

11   going to use at trial with her as a witness which will have

12   these documents as part of it.

13   604.              BY MR. DERKSEN:  Q.  What relevance do the

14   documents that relate to prints that Mr. Sackman did not

15   purchase have to this appeal?

16                     MR. TEPLITSKY:  Their relevance is simply

17   to illustrate what the artist for a comparable piece was

18   being sold for at that time.  You'll see that these are

19   all, I think, in and around the 2000 year, so they're not

20   2006, or 1996, or 2004, et cetera, documents.  I asked to

21   get documents on or about 2000, to show what the fair

22   market value was at that time.  In any event, while we're

23   at it, there are other potential cases that these documents

24   will be useful for as well.  Anyway, I just gave it to you,

25   you don't need to read more into it than my view that I

MHFeltman Verbatim Reporting                                        Jeffrey Sackman

1    have a duty to provide you with copies of the material that

2    we have and get.

3    605.            BY MR. DERKSEN:  Q.  Does this binder

4    contain all of the documents that Yeomans or Rosoff have

5    obtained with respect to sales of same subject properties

6    or what they viewed as comparable subject properties?

7                    MR. TEPLITSKY:  You have everything I

8    have.  I have not edited this or removed a single sheet of

9    paper.

10                   MR. DERKSEN:  I have everything that you

11   have.

12                   MR. TEPLITSKY:  That's right.

13   606.            BY MR. DERKSEN:  Q.  Has Yeomans provided

14   you with everything....

15                   MR. TEPLITSKY:  I don't know.

16   607.            BY MR. DERKSEN:  Q.  What I'm asking, Mr.

17   Teplitsky, is has Yeomans obtained invoices at lower

18   amounts?

19                   MR. TEPLITSKY:  Not that I'm aware of.

20   608.            BY MR. DERKSEN:  Q.  Is Yeomans aware of

21   any transactions at lower amounts?

22                   MR. TEPLITSKY:  I'm not aware of any.  She

23   certainly hasn't provided me with any, nor did I tell her

24   not to provide me with any.  I said, "Get me the documents,

25   if you can," but they're hard to get.  It's not like these

MHFeltman Verbatim Reporting

1    people are all that anxious to say, "Here's my client list

2    and here's what I'm doing."  She also relied on list prices

3    at Ro and list prices on the Internet, but that's not

4    included.  These are actual sales.  Because someone would

5    say, "There's your list price, but what are you actually

6    selling them for?"

7    609.          BY MR. DERKSEN:  Q.  Do you know whether

8    Yeomans wrote to any of these sources?

9                 MR. TEPLITSKY:  I don't know whether she

10   wrote or how she went about it.  I think it was through

11   oral pestering and persistence.

12   610.          BY MR. DERKSEN:  Q.  Are you prepared to

13   ask her?  In essence, Mr. Teplitsky, if you're going to be

14   relying on this stuff, I'd like to see the correspondence

15   that's being provided....

16                 MR. TEPLITSKY:  I know you would, but

17   maybe at trial you can cross-examine her on this stuff.

18   I'm not going to make a huge work project for myself

19   because I'm fulfilling what I think is my ethical

20   obligation to get you the papers I have.  I didn't ask her,

21   "Did you write them any letters?"

22   611.          BY MR. DERKSEN:  Q.  Are you prepared to

23   ask her now?

24   **REF 126**       MR. TEPLITSKY:  No, I'm not interested,

25   frankly.  I trust that she's an honourable person, recently

MHᵗ

205

MHFeltman Verbatim Reporting

Jeffrey Sackman

1   elevated to a higher position in the American Academy of

2   Appraisers, and that she's doing her job honestly.  You're

3   obviously skeptical and questioning or suspicious.  I'm

4   not.

5               MR. DERKSEN:  I'm only as suspicious as

6   the Appellant appears to be vis-à-vis our Navigant stuff.

7               MR. TEPLITSKY:  I told you I don't have

8   any facts to say that it's inauthentic, but how I could

9   admit the authenticity escapes me.

10              MR. DERKSEN:  I'm not going to answer that

11  question.

12              MR. TEPLITSKY:  I won't ask your client

13  tomorrow to admit that these are authenticity documents,

14  though I might ask him if he has any information that

15  they're not.

16  612.          BY MR. DERKSEN:  Q.  Many of these

17  documents are redacted.

18              MR. TEPLITSKY:  Yes, and they were not

19  redacted by me or by her.  These are redacted by the

20  vendors who didn't want the name of the client to be

21  disclosed.

22  613.          BY MR. DERKSEN:  Q.  Is the Appellant

23  prepared to make efforts to provide un-redacted copies?

24              MR. TEPLITSKY:  I don't have them.  This

25  is what they gave us after a hell of a lot of effort,

MHFeltman Verbatim Reporting

Jeffrey Sackman

1   according to her.  I didn't make the effort, all I've been

2   is persistent in bugging them to get it and they've been

3   the ones getting it and they're getting what they can get.

4   614.         BY MR. DERKSEN:   Q.   The binder contains

5   documents that appear to come from Charles Bragg, perhaps

6   Charles Lynn Bragg or Ro Gallery.  Did Yeomans obtain any

7   documentation from those three sources (Charles Bragg,

8   Charles Lynn Bragg, or Ro Gallery or Robert Rogale[?])

9   about sales to Coleman Fine Arts, Silver Fine Arts, or Paul

10  Sloan?

11             MR. TEPLITSKY:   No.   I didn't ask her

12  that, I knew you already had them.  In any event, it's not

13  relevant as far as I'm concerned.  I'm prepared — if one

14  wanted to talk to shorten this case, I am prepared to say

15  that there are different markets and here's the value for

16  the different markets, and if retail market isn't the right

17  market, then we're wrong.  I cannot justify the appraised

18  amounts other than as retail market appraisals.  So if you

19  want to say that you could buy these things at wholesale or

20  get them directly from the painter or the artist for less

21  money than what was shown, I don't have any doubt.  Whether

22  those are exactly the right numbers, but I know that there

23  is a huge difference, as there are in diamonds and other

24  commodities, between buying at source and selling retail.

25  615.          BY MR. DERKSEN:   Q.   It seems clear to me

Ւ/Ӏ╪ӀⱫ

MHFeltman Verbatim Reporting                                                    Jeffrey Sackman

1    that Yeomans has access to Charles Bragg, Charles Lynn

2    Bragg, Ro Gallery.

3                    MR. TEPLITSKY:  She seems to have access

4    to the Braggs and to Ro Gallery, but that doesn't mean that

5    they're sitting there and saying to her, "Edy, what else

6    can I give you?"  I think you will find out if you examine

7    her at trial, and I will ask her about the lengths that she

8    had to go to to get what I've produced thus far.

9    616.            BY MR. DERKSEN:  Q.  Are you prepared to

10   have Yeomans make inquiries of Charles Bragg, Charles Lynn

11   Bragg, and Robert Rogale about what....

12                   MR. TEPLITSKY:  Why don't you hire your

13   own expert and then your own expert can go and make these

14   inquiries for you?

15   617.            BY MR. DERKSEN:  Q.  I take it that you're

16   not prepared to have her make these inquiries.

17   **REF 127**      MR. TEPLITSKY:  If they are to advance

18   your case, no.  If you think there are some inquiries I

19   could make to advance my case, I'd be happy to hear what

20   you had to say on that.

21                   MR. DERKSEN:  You'd be happy to have me

22   help you with that, would you?

23                   MR. TEPLITSKY:  Yes, of course, but you

24   seem to be as reluctant to help me with my case as I am

25   possibly to want to help you, of course.

MHFeltman Verbatim Reporting

Jeffrey Sackman

1    618.          BY MR. DERKSEN:  Q.  These pages are

2    numbered and there's a page I would like to ask you to turn

3    up at A27.  This appears to be a letter from Charles Bragg

4    to Edy Yeomans.  Reference is made about four paragraphs

5    in:  "If the Dyansen or Martin Lawrence dealers were the

6    original sources to other galleries it could be an

7    aberration, not a yardstick."  Are you prepared to make

8    inquiries of Yeomans to find out what information she

9    received about Dyansen?

10   **REF 128**       MR. TEPLITSKY:  No.

11   619.          BY MR. DERKSEN:  Q.  Did she know whether

12   Dyansen was a gallery that was owned by Paul Sloan?

13                 MR. TEPLITSKY:  I have no idea who Dyansen

14   is.

15   620.          BY MR. DERKSEN:  Q.  Are you prepared to

16   ask her that?

17   **REF 129**       MR. TEPLITSKY:  No, I'm not.  Pretty soon

18   I'll stop sending you the material I get, if this is my

19   reward, to find tasks for me to do supplementary to my

20   disclosure.

21                 MR. DERKSEN:  It's Mr. Sackman's

22   disclosure and wouldn't it be nice if he was able to

23   address these things so you didn't have to, but we have an

24   understanding about that.

25                 MR. TEPLITSKY:  No, we don't, because why

MHFeltman Verbatim Reporting                                      Jeffrey Sackman

1    can't you — you're very sensitive to anything and how could

2    he possibly know anything about these things when this is

3    the preparation for his case for trial with his expert?

4    Why would the litigant himself be familiar with these

5    things?  He wouldn't be.  So why are you acting like this

6    is some sort of a big shock to you?

7    621.            BY MR. DERKSEN:  Q.  As part of Yeomans's

8    contact with Bragg, are you prepared to ask Yeomans whether

9    Bragg told her that he was selling prints to Paul Sloan?

10   **REF 130**       MR. TEPLITSKY:  No, I'm not.  I think if

11   you read this letter, what he's trying to say is that there

12   are occasions where people pick up these prints at very low

13   prices because of this, that, and the other thing, like

14   dealers going bad and what have you.  He is, generally

15   speaking, not in this market any more and that's how I

16   construed the letter.  But anyway, I'm not going to ask her

17   any more questions, but I will continue to supply you with

18   documents that she provides.

19   622.            BY MR. DERKSEN:  Q.  With respect to

20   Yeomans's contact with Ro Gallery, did she ask for all of

21   the sales of the subject titles or similar pieces?

22                   MR. TEPLITSKY:  I can only tell you what I

23   instructed her to do, which was to find out for me and

24   obtain for me invoices about retail sales or sales to

25   dealers which are wholesale, sort of high-end wholesale.

MHFeltman Verbatim Reporting                                    Jeffrey Sackman

1    That's what I asked her to do.

2    623.              BY MR. DERKSEN:   Q.  Do any of the

3    invoices in the binder pertain to sales of groups of

4    prints?

5                      MR. TEPLITSKY:  No.  While there are some

6    that have more than one print to them, but if you mean

7    group volumes, no.  No, these are retail.

8                      MR. DERKSEN:   Individual sales of one

9    print here, one print there.

10                     MR. TEPLITSKY:  That's right, or two

11   prints or what have you.  This is the retail market.

12   624.              BY MR. DERKSEN:   Q.  Do any of these

13   invoices relate to prints that were sold as part of an art

14   donation program?

15                     MR. TEPLITSKY:  I hope not.

16   625.              BY MR. DERKSEN:   Q.  There is a series of

17   documents that appear to be in Japanese.

18                     MR. TEPLITSKY:  They're Japanese to me,

19   too.  I could help you with your French.

20   626.              BY MR. DERKSEN:   Q.  Is the Appellant

21   going to translate those documents?

22                     MR. TEPLITSKY:  No.

23                     MR. DERKSEN:  You won't provide us with a

24   translation.

25   U/T 131            MR. TEPLITSKY:  I'm not providing myself

MHFeltman Verbatim Reporting                                    Jeffrey Sackman

1    with one.  If I get myself a translation, Mr. Derksen, I

2    will certainly give you a copy.  Meanwhile, I don't have

3    one and at the moment I don't intend to get one.

4    627.            BY MR. DERKSEN:  Q.  Do you know how

5    Yeomans obtained these invoices in Japanese?

6                    MR. TEPLITSKY:  I have no idea, but I

7    imagine that they're from a dealer, but I'm only guessing.

8    628.            BY MR. DERKSEN:  Q.  Are you prepared to

9    ask her that?

10                   MR. TEPLITSKY:  I will ask her, obviously,

11   for my own purposes.

12   629.            BY MR. DERKSEN:  Q.  Are you prepared to

13   make inquiries of Yeomans and ask and advise where she got

14   these?

15   U/T 132         MR. TEPLITSKY:  I have not met with Edy

16   Yeomans since I got the last bundle.  I met with her after

17   the first bundle, I haven't met with her since I got the

18   last bundle.  I forwarded them to you immediately, but I

19   had only received them very shortly before December 7.  So

20   I'll ask her about the Japanese ones because, obviously,

21   they're not very plain.

22                   MR. DERKSEN:  We'd like to know where they

23   came from.

24                   MR. TEPLITSKY:  That's fine, I'd like to

25   know, too.

MHFeltman Verbatim Reporting

Jeffrey Sackman

1   630.            BY MR. DERKSEN:  Q.  In addition, Mr.

2   Teplitsky, if we could have an explanation as to what the

3   Appellant says the reference to the 40 percent amount

4   means.  We have no idea.

5                   MR. TEPLITSKY:  Where is that?

6                   MR. DERKSEN:  For example, pages B11, B12,

7   B13, B14.

8                   MR. TEPLITSKY:  The Japanese ones.

9                   MR. DERKSEN:  Yes, B14, B15, and so on.

10  Those are just representative.

11  U/T 133         MR. TEPLITSKY:  I will find out for you.

12  631.            BY MR. DERKSEN:  Q.  And also, just as

13  you've got some of those Japanese invoices, there is also

14  some handwriting.  If that's handwriting of Yeomans, if you

15  could just identify that.

16  U/T 134         MR. TEPLITSKY:  I'll ask her whose

17  handwriting it is.

18  632.            BY MR. DERKSEN:  Q.  Mr. Teplitsky, as

19  part of the difficulty that we're having understanding

20  these documents insofar as they're in Japanese, if you

21  could provide us with some explanation as to how we can

22  determine the dates.  It's not always clear to us.

23                  MR. TEPLITSKY:  I think it's right up

24  here.

25                  MR. DERKSEN:  At B11, for example.

MHFeltman Verbatim Reporting

213

Jeffrey Sackman

1    U/T 135         MR. TEPLITSKY:  It's September 004, but

2    anyway, I'll check with her on the dates.

3    633.            BY MR. DERKSEN:  Q.  And then within the

4    binder there is a series of price lists.  What, if any,

5    relevance does the Appellant say....

6                    MR. TEPLITSKY:  I think the price lists

7    are some evidence of what the retail market is.  They're

8    not as good evidence as actual sales, but they are the

9    advertised selling prices of the goods.  The same thing, do

10   you value a house on what the listed price was?  It's some

11   indication of value, but the better indication is what did

12   it actually sell for.

13   634.            BY MR. DERKSEN:  Q.  Is Yeomans aware of

14   any actual sales at the amounts stated in the price lists,

15   these Internet price lists?

16                   MR. TEPLITSKY:  She can't get that

17   information.  We haven't yet figured out how to access that

18   information, but one, I suppose, can assume that people

19   don't advertise endlessly on the Internet if they're not

20   doing any business, but this is an inference.  If I could

21   get that, believe me, I would have it, but we're going to

22   keep on trying.  This is a work in process.

23                   MR. DERKSEN:  Off the record, please.

24   --- RECESS

25   635.            BY MR. DERKSEN:  Q.  Mr. Teplitsky, I'm

MHFeltman Verbatim Reporting

Jeffrey Sackman

214

1  given to understand that I may not have actually used the

2  words "working papers" when I asked for materials and the

3  files of Rosoff and Yeomans as far as it relates to before

4  the litigation concerning the appraisals.

5          MR. TEPLITSKY:  Yes, you only used it

6  maybe ten times.

7          MR. DERKSEN:  If I didn't, can we make it

8  clear that my request included the working papers.

9          MR. TEPLITSKY:  That's fine.

10          MR. DERKSEN:  The Crown is prepared to

11  adjourn the discovery subject to questions arising from the

12  undertakings and subject to the disposition of any refusal

13  motions that the Crown may proceed with.

14          MR. TEPLITSKY:  That's fine.

15          MR. DERKSEN:  Thank you.

16          MR. TEPLITSKY:  Thank you.

17

18          CERTIFIED CORRECT

19

20          Holly Feltman, C.V.R.

21

22

23

24

25

F