**THIS IS EXHIBIT "J"**
**referred to in the affidavit of**
**Laura Alescio**
This $\underline{30^{th}}$ day of September, 2011

_____
**Commissioner for Taking Affidavits**

# TEPLITSKY, COLSON
## BARRISTERS

SUITE 200
70 BOND STREET
TORONTO, ONTARIO
M5B 1X3

**JOYCE HARRIS**
Certified by the Law
Society as a Specialist
in Civil Litigation

TEL: (416) 365-9320
FAX: (416) 365-7702

DIRECT LINE: (416) 865-5344
E-MAIL: jharris@teplitskycolson.com

## *FACSIMILE*

**DATE:**                                    Wednesday, September 8, 2004

**TO:**   (individual's name)               Laura Alescio
          (firm name)

**FAX NO. CALLED:**                         **416-973-0810**

**FROM:**                                   Joyce Harris

**FIRM:**                                   Teplitsky, Colson

**FILE NAME AND NUMBER:**                   Artistic Ideas 15777

**TOTAL PAGES** (including this page):   2

**IN CASE OF TRANSMISSION PROBLEMS, PLEASE CONTACT MAUREEN AT 365-9320**

**COMMENTS/INSTRUCTIONS:**

IMPORTANT NOTE:
The following material is intended for use only by the individual or entity to which it is specifically addressed above and should not be read by, or delivered to, any other person. Such material may contain privileged or confidential information, the disclosure or other use of which by other than the intended recipient may result in the breach of certain laws or the infringement of rights of third parties. If you have received this telecopy in error, kindly notify us immediately by calling our offices (collect if necessary) at (416) 365-9320, and then return the original transmission to us by mail, and destroy this telecopy and any confirmation copy which you may receive by mail, at our expense. We thank you in advance for your cooperation and assistance.

# TEPLITSKY, COLSON
## BARRISTERS

SUITE 200
70 BOND STREET
TORONTO, ONTARIO
M5B 1X3

JOYCE HARRIS
Certified by the Law
Society as a Specialist
in Civil Litigation

TEL: (416) 365-9320
FAX: (416) 365-7702

DIRECT LINE: (416) 865-5344
E-MAIL: jharris@teplitskycolson.com

September 8, 2004

**Delivered by Fax**
Ms. Laura Alescio
Department of Justice Canada
Ontario Regional Office
The Exchange Tower
130 King Street West
Suite 3400, Box 36
Toronto, Ontario
M5X 1K6

Dear Ms. Alescio:

**Re: Jeffrey Sackman v H.M.Q.**

We acknowledge receipt of your letter of September 7, 2004. However, we consider your requests for information to be inappropriate and accordingly we will not be responding.

Yours very truly,

**Joyce Harris**
JH/mm

c.c. M. Pearlman

**K**

**THIS IS EXHIBIT "K"**
**referred to in the affidavit of**
**Laura Alescio**
This 30th day of September, 2011

_____
**Commissioner for Taking Affidavits**

2003-1855(GST)G

## TAX COURT OF CANADA

BETWEEN:

### ARTISTIC IDEAS INC.

Appellant

and

### HER MAJESTY THE QUEEN

Respondent

## MOTION RECORD

**ROBINS, APPLEBY & TAUB LLP**
Barristers & Solicitors
120 Adelaide Street West
Suite 2600
Toronto, ON  M5H 1T1

**Irving Marks** LSUC#19979H
Tel: 416.360.3329
**Shawn Pulver** LSUC#51129L
Tel: 416.360.3803
Fax: 416.868.0306

Solicitors for the Appellant

2

**TO:**    **PERRY DERKSEN**
Department of Justice
Ontario Regional Office
The Exchange Tower
130 King Street West
Suite 3400, Box 36
Toronto, ON  M5X 1K6

Tel: (416) 952-1504
Fax: (416) 973-0810

Counsel for the Respondent

3

## INDEX

| TAB | DOCUMENT |
|-----|----------|
| 1 | Notice of Motion |
| 2 | Affidavit of Paul Sloan |

Court No. 2003-1855(GST)G

**TAX COURT OF CANADA**
*In the Excise Tax Act, R.S.C. 1985, c. E-15, as amended*

BETWEEN:

**ARTISTIC IDEAS INC.**

Appellant

- and -

**HER MAJESTY THE QUEEN**

Respondent

**NOTICE OF MOTION**

**TAKE NOTICE THAT** the Appellant will make a motion to the Court on Tuesday, September 5, 2006, at 9:30 a.m., or as soon after that time as the motion may be heard at 180 Queen Street West, Suite 200, Toronto, Ontario.

**THE MOTION IS FOR:**

    (a)    An Order granting the Appellant leave to file the Affidavit of Mr. Paul Sloan, sworn August 28, 2006, with cross-examination and re-examination to be conducted by telephone or video conference; or

    (b)    An Order permitting the evidence of Mr. Paul Sloan to be taken by video or telephone conference; or

    (c)    An Order to allow for the evidence of Mr. Paul Sloan to be taken by commission in California; or

    (d)    Such further or other Order as this Court deems just.

2

**THE GROUNDS FOR THIS MOTION ARE:**

(a)     The Appellant wishes to call Mr. Paul Sloan, a resident of California, as a witness at trial;

(b)     On August 28, 2006, Mr. Sloan swore an Affidavit concerning his companies' dealings with the Appellant;

(c)     Mr. Sloan is 70 years-old, and has recently become concerned about flying in light of increased terrorism concerns;

(d)     As the date for attendance in Toronto approached, Mr. Sloan decided that he did not want to travel to Toronto;

(e)     Mr. Sloan's advisor informed the Appellant's counsel on August 29, 2006, of his decision not to fly to Toronto.

(f)     Although Mr. Sloan is not prepared to fly to Toronto, he is willing to testify via either phone or video conference, or in person in California;

(g)     The Appellant is willing to pay the costs of either the video conference or commissioning the evidence as may be ordered;

(h)     Mr. Sloan is a material witness. The Appellant will be unduly prejudiced if not granted leave to obtain his evidence;

(i)     Sections 143(1)(a), 4(1) and (2), 9, 119-122 of the *Tax Court of Canada Rules (General Procedure).*

3

THE FOLLOWING DOCUMENTARY EVIDENCE will be used at the hearing of the motion:

     (a)    Affidavit of Paul Sloan, sworn August 31, 2006;

     (b)    Such other evidence as this Honourable Court may permit.

Date: Friday, September 1, 2006

                                        **ROBINS, APPLEBY & TAUB LLP**
Barristers & Solicitors
120 Adelaide Street West
Suite 2600
Toronto, ON  M5H 1T1

**Irving Marks** LSUC#19979H
Tel: 416.360.3329
**Shawn Pulver** LSUC#51129L
Tel: 416.360.3803
Fax: 416.868.0306

Solicitors for the Appellant

TO:    **PERRY DERKSEN**
         Department of Justice
         Ontario Regional Office
         The Exchange Tower
         130 King Street West
         Suite 3400, Box 36
         Toronto, ON  M5X 1K6

         Tel: (416) 952-1504
         Fax: (416) 973-0810

         Counsel for the Respondent

r:\files\060007.3\int\pleadings\notice of motion.doc

2003-1855(GST)G

## TAX COURT OF CANADA

**B E T W E E N :**

### ARTISTIC IDEAS INC.

Appellant

- and -

### HER MAJESTY THE QUEEN

Respondent

---

### NOTICE OF MOTION

---

Robins, Appleby & Taub LLP
Barristers & Solicitors
120 Adelaide Street West
Suite 2600
Toronto, ON  M5H 1T1

**Irving Marks** LSUC#19979H
Tel: 416.360.3329
**Shawn Pulver** LSUC#51129L
Tel: 416.360.3803
Fax: 416.868.0306

Solicitors for the Appellant

2003-1855(GST)G

## TAX COURT OF CANADA

BETWEEN:

## ARTISTIC IDEAS INC.

Appellant

and

## HER MAJESTY THE QUEEN

Respondent

## AFFIDAVIT OF PAUL SLOAN

I, PAUL SLOAN, of the City of Woodland Hills, in the State of California, MAKE

OATH AND SAY AS FOLLOWS:

1.      I am the President and sole shareholder of Coleman Fine Arts Ltd. and Silver Fine Arts Ltd.,
which are incorporated pursuant to and do business under the laws of California, and as such have
knowledge of the facts to which I depose.

2.      Over the past several weeks, I, together with my advisors, Mr. Glen Alpert and Elliot Kajan
have had discussions with the lawyers for Artistic Ideas Inc. ("Artistic"), in preparation for my
attendance as a witness at Artistic's income tax appeal, commencing on September 5, 2006, in
Toronto, Ontario, Canada.

3.      On August 28, 2006, I swore an Affidavit concerning my companies' dealings with Artistic.

4.      I am 70 years old, and recently have become scared about flying in light of increased terrorism
concerns. I am of Jewish descent and the increase of anti Semitism throughout the Middle East and
United States has me concerned for my safety as well as Jews worldwide. As the date for attendance

2

in Toronto approached, I decided under concerns from my family and friends that I could not travel until the threats of terrorism dissipate.

5.    Mr. Alpert informed Mr. Marks, counsel for Artistic, on August 29, 2006, of my decision and my fears of travel at this time. Although I will not travel, I am willing to testify via either phone or videoconference, or in person in California.

SWORN before me at the City of            )
                    , In the State of      )
California,                                )
This        day of, 2006.                  )
                                           )    _____
A Commissioner, Notary, etc.               )    Paul Sloan

PLEASE SEE ATTACHED
CALIFORNIA CERTIFICATE

r:\files\060073\im\pleadings\affidavit of p. sloan #2.doc

# JURAT

State of California

County of _San Diego_

Subscribed and sworn to (~~or affirmed~~) before me on

this___ _31_ ___day of _____ _August_ _____ ,20_06_ ,

by ___ _Paul Sloan_ _____

personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

BERRIE A. SYREK
Commission # 1559804
Notary Public - California
San Diego County
My Comm. Expires Mar 15, 2009

(seal)

Signature ___ _Berrie A. Syrek_ ___

2003-1855(GST)G

## TAX COURT OF CANADA

**B E T W E E N :**

### ARTISTIC IDEAS INC.

Appellant

- and -

### HER MAJESTY THE QUEEN

Respondent

---

## MOTION RECORD

---

Robins, Appleby & Taub LLP
Barristers & Solicitors
120 Adelaide Street West
Suite 2600
Toronto, ON  M5H 1T1

**Irving Marks**  LSUC#19979H
Tel: 416.360.3329
**Shawn Pulver**  LSUC#51129L
Tel: 416.360.3803
Fax: 416.868.0306

Solicitors for the Appellant

L

**THIS IS EXHIBIT "L"**
**referred to in the affidavit of**
**Laura Alescio**
This <u>30th</u> day of September, 2011

_____

**Commissioner for Taking Affidavits**

COMMISSION EVIDENCE

TAX COURT OF CANADA

ARTISTIC IDEAS, INC.,              )

             Appellant,    )

                          )

   AND                             )     No. 2003-1855(GST)G

                          )

HER MAJESTY THE QUEEN,             )

            Respondent.   )

_____)

**CERTIFIED COPY**

TRANSCRIPT OF PROCEEDINGS

WEDNESDAY, NOVEMBER 29, 2006

BEVERLY HILLS, CALIFORNIA

REPORTED BY:
JEANINE CURCIONE
CSR NO. 10223, RPR
JOB NO. 061129JCU

Tel. 310.859.6677  Fax 310.859.6694



Gradillas
COURT REPORTERS
345 N Maple Dr, Suite185, Beverly Hills, CA 90210

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

COMMISSION EVIDENCE

TAX COURT OF CANADA

ARTISTIC IDEAS, INC.,                    )
                                         )
                    Appellant,           )
                                         )
        AND                              )        No. 2003-1855(GST)G
                                         )
HER MAJESTY THE QUEEN,                   )
                                         )
                    Respondent.          )
_____)

TRANSCRIPT OF PROCEEDINGS

WEDNESDAY, NOVEMBER 29, 2006

BEVERLY HILLS, CALIFORNIA

REPORTED BY:
JEANINE CURCIONE
CSR NO. 10223, RPR
JOB NO. 061129JCU

1

```
1              TRANSCRIPT OF PROCEEDINGS, taken at 9:35 A.M.,

2    Wednesday, November 29, 2006, at 345 North Maple Drive,

3    Suite 185, Beverly Hills, California, before Jeanine

4    Curcione, C.S.R. No. 10223, RPR, pursuant to notice.

5

6    APPEARANCES OF COUNSEL:

7    COMMISSIONER PARIS

8    JENNA L. CLARK, REGISTRAR

9
     FOR THE APPELLANT:
10
          ROBINS, APPLEBY & TAUB, LLP
11        BY:  IRVING MARKS, ESQ.
          120 Adelaide Street West
12        Suite 2600
          Toronto, Ontario M5H 1T1
13

14   FOR HER MAJESTY THE QUEEN:

15        DEPARTMENT OF JUSTICE CANADA
          BY:  PERRY DERKSEN, ESQ.
16        130 King Street West
          Suite 3400, Box 36
17        Toronto, Ontario M5X 1K6

18   FOR THE WITNESS:

19        KAHAN, MATHER AND BARISH
          BY:  ELLIOTT H. KAJAN, ESQ.
20        9777 Wilshire Boulevard
          Suite 805
21        Beverly Hills, California 90212

22

23

24

25
                                                         2
```

INDEX

WITNESS          DIRECT EXAMINATION   CROSS-EXAMINATION

PAUL SLOAN                5                      33

REDIRECT EXAMINATION      FURTHER REDIRECT

     80                        106

RECROSS EXAMINATION

     110

E X H I B I T S

NO.        FOR IDENTIFICATION

A2              31

R5              55

R6              56

R7              65

R8              67

R9              70

R10             74

A3              81

3

GRADILLAS COURT REPORTERS
(310) 859-6677

```
 1              BEVERLY HILLS, CALIFORNIA;

 2        WEDNESDAY, NOVEMBER 29, 2006, 9:35 A.M.

 3

 4        MR. MARKS:  Good morning, Your Honor.  I wonder

 5   if, given the conference setting here, if we could

 6   conduct this seated.

 7        THE COMMISSIONER:  That's fine.  I think that's

 8   more logical.

 9        MR. MARKS:  We're here to hear the evidence of

10   Mr. Paul Sloan.  He's here and ready to testify.

11        THE COMMISSIONER:  And Madam Registrar, would

12   you have the witness sworn and affirmed.

13

14                    PAUL SLOAN,

15            having been first duly sworn, was

16            examined and testified as follows:

17

18        THE REGISTRAR:  Please state your full name and

19   occupation.

20        THE WITNESS:  Paul Malcolm Sloan.  My address is

21   6041 Fenwood Avenue, Woodland Hills, California.  And

22   my occupation is retired.

23        THE COMMISSIONER:  Thank you.

24        Mr. Marks.

25        MR. MARKS:  Thank you, Your Honor.  Mr. Sloan

                                                            4
```

1   has a back problem that he needs to stand up every so

2   often to stretch his back, so if we could accommodate

3   him at appropriate times?

4        THE COMMISSIONER:  I understand.  If you're

5   aware that Mr. Sloan would like to stand, if

6   Mr. Sloan -- is that chair --

7        MR. KAJAN:  Hopefully it was the chair and not

8   your back.

9        THE COMMISSIONER:  In any event, if you would

10  let us know if you need to stand while you're giving

11  testimony, that's fine.

12       MR. MARKS:  Thank you very much.

13       Mr. Sloan, could you --

14       THE COMMISSIONER:  Let's stop for a second and

15  change the chair.

16            (Recess taken.)

17

18            DIRECT EXAMINATION

19  BY MR. MARKS:

20       Q.  Mr. Sloan, I understand that you know Allan

21  Grossman and Mark Pearlman?

22       A.  That's correct.

23       Q.  And how did you come to know those two

24  individuals?

25       A.  I met them in Toronto, Canada, in the mid

5

1    '90s.

2        Q.   And what were the circumstances under which

3    you met?

4        A.   Originally, I went to Allan Grossman's

5    office to solicit him regarding an investment I had.

6        Q.   And what business were you in at that time?

7        A.   I was in investment banking, California.

8        Q.   And what was the purpose of your meeting

9    with Mr. Grossman?

10       A.   I had a company that I was raising money

11   for, and I was introduced to Allan by a friend of mine

12   who said he might be able to help me.

13       Q.   And what was your understanding of what

14   business Mr. Grossman was in at that time?

15       A.   Well, he was in the investment banking

16   business, and he raised money for companies.

17       Q.   And what was the particular venture that you

18   were seeking to raise money for at that time?

19       A.   It was a company called Protosource.  It was

20   a software company.

21       Q.   And did Mr. Grossman express interest in

22   that?

23       A.   Originally, no.  We did have a nice

24   discussion, and he invited me back if I had anything

25   else to show him.

6

1    Q.   And did his interest change after a period

2  of time?

3    A.   His interest changed the following year.  I

4  went back to see him, and I had raised some money on

5  that particular company the previous year, and we were

6  still looking to raise additional funds for it, and at

7  that time he was interested.

8    Q.   And did you -- did Mr. Grossman proceed to

9  raise funds for that transaction?

10    A.   Yes.

11    Q.   Over what period of time did you work with

12  Mr. Grossman on that?

13    A.   I worked with him for a two-year period.

14    Q.   Was Mr. Pearlman involved in that venture?

15    A.   Yes.

16    Q.   Did they have a company they were using to

17  do that?

18    A.   Yes.

19    Q.   Do you remember the name of the company?

20    A.   I think it was ASG, but I'm not positive.

21    Q.   And through the course of that, did you get

22  to know Mr. Pearlman?

23    A.   Yes.  We became very friendly.  We became

24  very social.

25    Q.   And were you social with Mr. Grossman as

7

```
 1   well?
 2        A.   Yes, very social.
 3        Q.   And what do you mean by that?
 4        A.   Well, they came down to L.A.  I went up to
 5   Toronto.  We became friends.
 6        Q.   At some point in your relationship with
 7   them, did you have any discussions with them about
 8   selling art in Canada?
 9        A.   Yes.
10        Q.   And when did that come up?
11        A.   That came up in the -- I think somewhere
12   around '98, somewhere in there, '97, '98, and I noticed
13   that there were a number of art programs being done in
14   Canada, and I was getting some calls from people in
15   Canada for art, and I told them -- they were very aware
16   of the programs.  It's nothing that I told them that
17   they weren't aware of.  They knew my background in the
18   art business, and I said if you're interested in
19   getting involved in anything like this, I could
20   definitely produce all the art you needed.
21        Q.   And when you say that they knew your
22   background in the art business, what was your
23   background in the art business?
24        A.   Well, I was a partner in a company called
25   Dyanson, D-y-a-n-s-o-n, which was -- we started out
```

8

1   with one gallery in New York, and eventually we had 11
2   galleries across the country, including Hawaii. And
3   the company, at one point, was doing over $50 million a
4   year.

5       Q.   Over how much?

6       A.   50 million.

7       Q.   50.   Thank you.

8       And these were retail art galleries or --

9       A.   These were retail art galleries.

10      Q.   Had you told Allan and Mark about this
11  business in the course of your discussion?

12      A.   Yes.

13      Q.   And you say that you became aware of art
14  programs being carried out in Canada.

15      What do you mean by an "art program"?

16      A.   Well, some of these were being sold with
17  various tax benefits, either a donation. Some were a
18  little different. They were all structured
19  differently. But the core of the deal was the art.

20      Q.   And you saw this -- you told them -- I think
21  you said that you saw this as an opportunity for you to
22  sell art in Canada and --

23      A.   Yes. I had a great deal of art in inventory
24  as well as all the connections in the business you
25  need, and if they had the ability, you know, to sell

9

1    the art, I could produce it.

2         Q.  And how much art inventory did you have at

3    that time?

4         A.  I would say $5 million worth.

5         Q.  And are you able to say how many separate

6    pieces of art that represented?

7         A.  Just in round numbers, a couple of hundred

8    thousand.

9         Q.  And at that time in or around 1998, were you

10   still in the Dyanson business of art galleries?

11        A.  No.

12        Q.  So this was inventory that you had been left

13   with when that business --

14        A.  Yeah.  We sold the business to London Fine

15   Arts in '95, and we kept a lot of inventory, my partner

16   and I.

17        Q.  And when you first raised this topic with

18   Allan and Mark, what was their response?

19        A.  Originally their response was -- Mark's

20   response was he had no interest.  Allan had a little

21   more interest.  It wasn't their cup of tea.

22        Q.  And did that change after a period of time?

23        A.  It did change.  I can't tell you exactly

24   when it happened, but it did change.  And they called

25   me and said they were interested doing an art deal and

                                                        10

1   would I be interested, and I said yes.

2       Q.  Did they have any specific proposal at that

3   time that they expressed to you or --

4       A.  Yeah.  They said they could be my agents in

5   Canada.  They had the ability to find purchasers for

6   the art.  They had an overhead.  They had offices.

7   They had people to sell the product.  They had

8   secretarial.  They had a warehouse.  They had backup.

9   And if I could provide the art, they would definitely

10  sell it.

11      Q.  Was there anything else discussed about the

12  price or fees at that time, or did that come later?

13      A.  It came later.

14      Q.  So what was your response to -- you told

15  them that you could --

16      A.  We started talking about the price of how we

17  would structure and the best way to operate, and I said

18  I'd be willing to give them a 50 percent commission on

19  anything they sold and, if that would work out for

20  them, it would work out for me.

21      Q.  And how did you decide that, in your mind,

22  that 50 percent would be reasonable?

23      A.  Well, at the time we had no idea, you know,

24  what volume would be and how much business there would

25  be, but they were willing to spend a considerable

11

1   amount of money to find the business, and they had had
2   an overhead and you couldn't -- you know, it wouldn't
3   have been fair to pay any less than 50 percent.
4        Q.  Did you discuss with them what the price for
5   the art would be and how you would arrive at it?
6        A.   They created the price for the art, which
7   was $3,500 for ten pieces, and then that changed to 11
8   pieces later.
9        Q.  And were there any conditions attached to
10  the type or value of art that had to be sold?
11       A.  Yes.  I had to get an appraisal for them
12  locally.  So I found an appraiser in L.A. by the name
13  of Dick Ruskin, who is a noted appraiser, and the
14  appraisals had to come in somewhere around a thousand
15  dollars Canadian, which would be what?  At the time was
16  about 650 U.S.
17       Q.  What was the reason that you had to provide
18  an appraisal at that value?
19       A.  Well, they needed that value in order to
20  create the type of structure they wanted.
21       Q.  And what was your reaction to the price of
22  $3,500 for ten pieces of art that had an appraised
23  value of at least a thousand dollars?
24       A.   Well, that was no problem because the
25  average print in those days sold for roughly a

12

1    thousand-plus.  This piece on the wall sold for

2    probably 3,000.

3        Q.  You're referring to a piece of art on the

4    wall of the conference room where this examination is

5    being held.

6        A.  Yes.

7        Q.  And what do you recall about how -- you say

8    that the art was going to be sold -- initial proposal

9    was that it would be sold in bundles of 10 pieces for

10   3,500 and then later it changed to 11.

11       A.  Yes.

12       Q.  What do you recall about when that change

13   occurred and what the reason for the change was?

14       A.  After they got involved, I think in

15   attempting to market the deal, and they felt because

16   they were going to allow the people to choose the art,

17   which as unique and unusual, that they would like to

18   have the investor have a piece of the art for his wall

19   to do whatever he wanted with.

20       Q.  And what was going to happen to the other

21   ten pieces?

22       A.  They were going to donate them.

23       Q.  Donate them to what?

24       A.  To a charity of their choice.

25       Q.  You said that it was your obligation to

13

1    provide the appraisal.

2            Did that mean that you had to pay for it?

3        A.  Yes.  That was my obligation.  The appraisal

4    was my obligation.  The shipping was my obligation, and

5    as it turned out, there were a few other odds and ends

6    expenses.

7        Q.  And what were the obligations of Allan and

8    Mark and eventually their company -- I haven't asked

9    you this, but did Allan and Mark create a company to

10   carry out this program?

11       A.  They created a company called Artistic

12   Ideas, and they had Allan's wife, Jeanine, was the

13   officer and -- I shouldn't say officer.  She was the

14   manager in charge of the office, and she basically

15   handled all the paperwork and the structure.  And she

16   had people under her, et cetera, and they handled the

17   expenses of creating a sales force, of managing that

18   sales force, the paperwork, the legal, the accounting,

19   expenses of running that type of a sales organization,

20   which are substantial.

21       Q.  Yes.

22            And were you involved in arranging for any

23   of the documentation for the sale of the art?

24       A.  No.

25       Q.  Who took care of that?

                                                        14

1      A.   Allan.  Allan Grossman.

2           Q.   And when the purchasers purchased these

3    bundles of 11 pieces of art from you, did you sign any

4    document between your company selling the art and the

5    purchaser?

6           A.   No.

7           Q.   How did those documents get signed?

8           A.   I authorized Allan to sign for Coleman.

9           Q.   Coleman was your company?

10          A.   Yes.

11          Q.   We've seen another company referred to in

12   the documents by the name of silver?

13          A.   Yes, Silver Fine Arts.

14          Q.   Is that also your company?

15          A.   Yes.

16          Q.   Did you authorize Allan to sign for that

17   company as well?

18          A.   Yes.

19          Q.   And as the deal was structured, did you have

20   any discussions with Allan or Mark regarding where

21   title to the art would be transferred?

22          A.   Well, title to the art was going to be

23   transferred in the United States because that's where

24   the art was.

25          Q.   And was there discussion about how and when

15

1    it would be donated to the charities?

2         A.  That was really their responsibility.

3         Q.  Were you involved in any of the

4    documentation relating to the purchaser's donation of

5    the art to the various charities?

6         A.  No.

7         Q.  So now once the program got underway and art

8    was being sold, how did you keep track of -- I missed

9    something.  Let me go back.

10             You said that you were going to provide the

11   appraisal and you named an appraiser.  Did it turn out

12   that Artistic used that appraiser?

13        A.  No.  They used that appraiser, but they also

14   provided one of their own.

15        Q.  Yes.  Do you know the name of that other

16   appraiser?

17        A.  Well, they had two appraisers, actually.

18   The first year they had Leslie Fink, and they then

19   subsequently had Edie Yeomans, who became the appraiser

20   for subsequent years after that.

21        MR. KAJAN:  Do you want to spell those names?

22   BY MR. MARKS:

23        Q.  Spell the names for the court reporter if

24   you can.

25        A.  Leslie Fink, L-e-s-l-i-e, F-i-n-k.  Edie

                                                    16

1   Yeomans, E-d-i-e, Y-e-o-m-a-n-s, I think.

2        Q.   And whose responsibility was it to pay for

3   those appraisals?

4        A.   It was my responsibility.

5        Q.   And once the sales program got underway,

6   were you involved at all in the marketing of the art in

7   Canada?

8        A.   No.

9        Q.   Whose responsibility was that?

10       A.   That was Allan and Mark's and their company.

11       Q.   And --

12       A.   Artistic Ideas.

13       Q.   And as I understand it, a significant volume

14   of art was actually sold under this program.

15       A.   Over the years, yes.

16       Q.   And in the first year as the sales got

17   underway, what system did you set up for keeping track

18   of which pieces were being sold and what inventories

19   would be required and so on?

20       A.   Well, they set up the system.  I didn't have

21   any system other than they would call me and let me

22   know how many units were sold, and by virtue of that, I

23   knew how much art I needed to gather and send to them

24   and have appraised.

25       Q.   You said that the purchasers were given the

17

```
 1   choice of various pieces of art --
 2        A.   That's correct.
 3        Q.   -- that they could purchase.
 4        A.   Right.
 5        Q.   And so how were you notified of which
 6   particular pieces had been sold and in which
 7   quantities?
 8        A.   Well, Jeanine would fax me a list every now
 9   and then of orders they received.
10        Q.   And when did you -- during the year, did you
11   take care of shipping the art to --
12        A.   I shipped the art year end.  Typically after
13   January.
14        Q.   And where did you ship the art to?
15        A.   I shipped the art to the charities in care
16   of Artistic Ideas.
17        Q.   And what was your understanding of what
18   Artistic Ideas was going to do with the art once it was
19   received?
20        A.   Well, they had people in the warehouse who
21   would receive the art, unpack the shipments, and check
22   to see if any of the art was damaged or wasn't in
23   pristine shape.  The particular appraiser they had in
24   Canada, Edie Yeomans, would come over and actually
25   check the art and wouldn't approve it unless it was
```

18

1   perfect.   And therefore, if there was any damage, they
2   would send it back, and I had to replace it.

3        Q.   And did you receive payments of your
4   50 percent of the purchase price from time to time from
5   Artistic?

6        A.   Yes.

7        Q.   How was that arranged?

8        A.   Well, there wasn't any specific arrangement.
9   As money came in, Allan would pick, I guess, a number
10  that he felt was taking his 50 percent and send me what
11  might be mine and -- until we settled up at the end of
12  the year.

13       Q.   And as I understand it, the agreement
14  between yourself and your companies on the one hand and
15  Allan and Mark and their company on the other hand is
16  not in writing; is that correct?

17       A.   No.   It wasn't in writing.

18       Q.   Was there a particular reason that it was
19  not in writing?

20       A.   Allan Grossman was supposed to actually come
21  up with a document but never did.

22       Q.   And was that a problem as far as you were
23  concerned?

24       A.   After the first year, it wasn't a problem.

25       Q.   Why not?

19

```
 1          A.   Well, we both felt comfortable with each
 2   other.  We had a certain amount of trust involved, and
 3   I had nothing to lose because I didn't have to deliver
 4   the art until the end of the year.  I always got an
 5   honest count.
 6          Q.   And by the time you delivered the art at the
 7   end of the year, had you received payment for the art
 8   that you were going to ship?
 9          A.   Yes.  I was paid, for the most part, in
10   full.
11          Q.   Now, you said that the purchase price that
12   you agreed to sell the art for was $3,500 for a bundle
13   of 11.
14          A.   Yes.
15          Q.   Did it ever happen that Allan or Mark wanted
16   to reduce or discount that price?
17          A.   Not so much in the first year.  There might
18   have been some instances, but there weren't that many
19   discounts.
20          Q.   Did they require your authority in order to
21   discount the price?
22          A.   No.
23          Q.   What if they wanted to reduce the amount
24   that was being paid to you?
25          A.   Then they would have to -- then they would
```

20

1    need my okay.

2        Q.   And we've seen in the documents in the

3    record some promissory notes that Artistic got from

4    purchasers.

5            Did Allan or Mark ever discuss with you the

6    fact that some purchasers gave promissory notes for

7    payment?

8        A.   No.

9        Q.   Did you ever accept any promissory notes

10   from purchasers?

11       A.   I didn't, no.

12       Q.   Were you made aware of the specific names of

13   purchasers who were purchasing the art?

14       A.   No.

15       Q.   You mentioned in your testimony that at year

16   end, there would be a tally of how much art had been

17   sold and how much was owing to you.

18       A.   Yes.

19       Q.   Did you receive something in writing from

20   Artistic with respect to that?

21       A.   Yes.

22       MR. MARKS:   Your Honor, at this point, I propose

23   to show Mr. Sloan some documents for identification,

24   and I know my friend has an objection.  These are the

25   year-end statements that came up during Mr. Pearlman's

21

1   testimony if you recall.

2         THE COMMISSIONER:  Yes.

3         MR. MARKS:  There are two possible ways to deal

4   with it -- maybe there are more than two, but one is we

5   could deal with and argue that objection here and now.

6         The other would be, with the Court's

7   permission -- and I don't believe Mr. Derksen is in

8   agreement with this, but I'm suggesting it as a

9   possible way to deal with it -- rather than take the

10   time now to argue the objection, that the Court hear

11   the evidence, allow Mr. Derksen to cross-examine on the

12   documents if he wishes and reserve the question of the

13   argument on the objection and the admissibility of that

14   evidence to when we resume the trial back in Toronto.

15         So I'm in your hands as to which way you -- and

16   I've seen that done many times, where the Court will

17   hear certain evidence and reserve the question of

18   admissibility to a later date as an expeditious means

19   of handling it.

20         So I'm in your hands.  I'm prepared to go

21   forward either way.  If we argue it now, I think it

22   would be appropriate to excuse Mr. Sloan while we do

23   that, but otherwise I would propose to proceed now and

24   ask him only a few questions about these documents, and

25   then Mr. Derksen could cross-examine.

22

1       THE COMMISSIONER:  Mr. Derksen?

2       MR. DERKSEN:  Thank you, Your Honor.

3       The Crown's position is that the issue of

4  admissibly should be resolved today, and there really

5  is no reason, in the Crown's view, it can't be resolved

6  today.  We have time.  We're here.  I'm prepared to

7  make more full submissions as to admissibility, but for

8  the practical matter how to proceed, it's the Crows's

9  position that the issue should be decided if possible

10  today and that way the parties know what evidence is

11  being admitted.

12      THE COMMISSIONER:  I understand your point.  But

13  it seems to me that, in the circumstances, it would be

14  more desirable to have the documents identified by the

15  witness, to deal with the objection on admissibility at

16  the resumption of the proceedings in Toronto, perhaps

17  not waiting until the end of the trial but to have the

18  matter dealt with in Toronto.

19      I think it's desirable in the sense that this is

20  a commission to take evidence outside of the country.

21  In the event that any ruling I made on the

22  admissibility were challenged to the federal court of

23  appeal and overturned, it would necessitate the parties

24  returning to California to obtain Mr. Sloan's evidence

25  on the point.

23

1     Given that possibility, I think it's more
2   desirable to have the witness identify the documents if
3   he's able to and to answer questions on them.

4     Given that this is a proceeding that is before a
5   judge alone, I don't think there's any difficulty that
6   I would have, in the event that you are successful in
7   your motion to exclude the evidence, for me to
8   disregard it.

9     MR. DERKSEN:  If that's your ruling, then
10  obviously the Crown respects that.  As the rules
11  provide, it's the Crown's position, however, that --
12  and we got into this a little bit, you may recall,
13  during the trial in September, but as the rules
14  provide, as the matter stands right now, there were
15  answers given by the Appellant corporation's nominee
16  during the discovery that had never been corrected and
17  that, in the Crown's view, are inconsistent with these
18  documents that my learned friend proposes to tender.
19  So there is a real problem here with the rules
20  providing that my learned friend can't lead this
21  evidence, and now we're about to embark on that
22  process.  So I make that observation, but if it's your
23  preference --

24     THE COMMISSIONER:  I'm not following you,
25  necessarily.  You're saying that the Appellant has not

24

1   corrected answers given on examination for discovery by
2   the nominee of the Appellant and therefore would be
3   precluded from leading the evidence in these documents?
4           MR. MARKS:  Without leave of the Court.
5           THE COMMISSIONER:  Without leave of the Court.
6           MR. DERKSEN:  That's correct.
7           We're into, Your Honor, a situation similar to
8   that which I ran into with Mr. Turner.  The
9   Appellant's nominee gave evidence during the discovery
10  in response to certain questions by my colleague,
11  Mr. Bornstein, B-o-r-n-s-t-e-i-n, about what type of
12  information, what type of reports were provided to
13  Mr. Sloan, and Mr. Pearlman gave, in the Crown's view,
14  some very specific answers, and it's the Crown's view
15  these documents are inconsistent with those answers.
16          So there are really two issues about the
17  admissibility of these documents and I suppose a third.
18  One is authenticity.  That hasn't been admitted by the
19  Crown through the usual pretrial steps.
20          But there are two issues.  One is these
21  documents weren't listed in the Appellant's list of
22  documents, and at about 2:15 on Friday, the eve of the
23  trial on September 1, I received an additional list of
24  documents which the Appellant, in somewhat hollow
25  compliance with the rules, put the Crown on notice that

                                                    25

1   they were serving an additional list of documents.

2   That's first obvious issue.

3   And secondly, as I state, rule 98, sub1,

4   provides that if the answers haven't been corrected on

5   the discovery, then if the evidence to be led is

6   favorable to the party, and it may be favorable, it's

7   not admissible except with the Court's leave.

8   So there really are two issues with the rules

9   and of course an issue of authenticity of the

10   documents.  I make that observation.  I realize that

11   you've expressed a preference for how to proceed today.

12   THE COMMISSIONER:  I think, and subject to any

13   comments that Mr. Marks has, I think that the most

14   practical way of proceeding is to have the evidence

15   heard and to decide subsequently whether or not that

16   evidence will be admissible -- ultimately admissible in

17   the determination that I have to make.

18   MR. MARKS:  I agree with that, Your Honor.  I

19   could respond to my friend now, but that would launch

20   us into the argument as to the admissibility, which

21   I've got a case brief here and so on which, as I

22   propose, I think for the reasons that Your Honor gave,

23   it makes ultimate good sense to reserve that to a later

24   date and to take the evidence so that whatever happens

25   in the future, we don't need to come back here and get

26

1  further evidence from Mr. Sloan.

2      THE COMMISSIONER:  I think that's best.  And I

3  think that the Court ultimately has control over its

4  own procedures and can make a determination even where

5  the issue of admissibility is not resolved in advance.

6  So I think I'm going to let counsel proceed with the

7  production of the documents and the questions for the

8  witness on those documents.

9      MR. DERKSEN:  Fair enough.

10     MR. MARKS:  Thank you, Your Honor.

11     Q.  And Mr. Sloan, you mentioned that you did

12  receive documents from Artistic at the year end giving

13  a tally, an accounting to you.

14     MR. DERKSEN:  As we proceed here, perhaps my

15  learned friend could establish whether he's going to

16  put an original to the witness or whether these will be

17  copies.

18     MR. MARKS:  These will be copies.

19     THE COMMISSIONER:  You can make any comments

20  that you'd like.

21     MR. DERKSEN:  Very well.  Just so the record is

22  clear then, Your Honor, the Crown has not admitted to

23  the authenticity to these documents, so if my learned

24  friend could establish their authenticity -- they are

25  not originals, and clearly the best evidence rule

27

1  contemplates the production of an original as an

2  exhibit in evidence.  So if my learned friend could not

3  address the issue of authenticity, then the Crown would

4  object to the introduction of these documents into

5  evidence.

6       THE COMMISSIONER:  Mr. Marks.

7       MR. MARKS:  Again, I have other witnesses to

8  call with respect to authenticity, so I propose to show

9  this witness copies of these documents and see if he

10  can identify them as copies of documents that he

11  received.

12       THE COMMISSIONER:  So they would be marked as

13  exhibits for identification subject to identification

14  and confirmation on authenticity at a later point in

15  the hearing?

16       MR. MARKS:  Yes.

17       THE COMMISSIONER:  Very well.  Then they will be

18  marked.  Madam Registrar will note that these will be

19  exhibits marked for identification only.

20       MR. MARKS:  Thank you, Your Honor.

21       Q.  Mr. Sloan, I'm showing you what appear to be

22  copies of statements or three sheets of paper, one

23  entitled "Coleman Year End January 31, 1999"; the

24  second one entitled "Coleman Year End, January 31,

25  2000"; and a third entitled "Coleman/silver Year End,

28

1   January 31, 2001."

2          And have you seen these documents before?

3      A.   Yes.

4      Q.   In what context?

5      A.   Well, this was a year-end reconciliation

6   that Allan would send me.

7      Q.   And what did these statements tell you?

8      A.   These statements told me the various

9   expenses that I was being charged or shared.

10     Q.   And what -- did it indicate anything about

11  how many pieces of art had been sold and at what price?

12     A.   Oh, sure.  Gross sales.

13     Q.   So just dealing with --

14     A.   But that number, I already know.

15     Q.   Yes.  How did you know that?

16     A.   Well, I knew that by virtue of how much art

17  they needed.

18     Q.   Yes.  And this was confirmation to you.

19     A.   Right.  This was confirmation.

20     Q.   And that's the first line of the statement,

21  and then the various adjustments are in the first

22  column?

23     A.   Their fee, which -- for 50 percent, which

24  they took.  Sales discount adjustments.  In this case,

25  there was a variety of adjustments.  Taxes.  I assume

29

1   this is customs taxes. Sales price reductions. In
2   this case, there was some reductions which we had
3   agreed to. Lawyer fee. Loss or brokerage. I'm not
4   sure what that was.
5       Q.   I think it says "less brokerage."
6       A.   Less brokerage. This had to do with the
7   brokerage or customs and wire charges which were for
8   wires sent to me.
9       Q.   And then it shows that after all those
10  adjustments, there's an amount of $2,095,963 of net
11  income?
12      A.   Right.
13      Q.   And then it shows the payments -- shows an
14  amount that says "less payments."
15      A.   Right.
16      Q.   And did that equate to the payments that you
17  had received to date?
18      A.   That's correct.
19      Q.   And then the last line says "net payable,"
20  and that would be the adjusting amount?
21      A.   Well, that was a minus $128.
22      Q.   Yeah, so it was pretty close?
23      A.   Yes, it was very close.
24      Q.   And are the two statements for the
25  subsequent years, do they take the same form?

                                                    30

1          MR. KAJAN:  Have they been actually marked?

2          MR. MARKS:  We'll do that in a moment.

3          THE COMMISSIONER:  Excuse me, sir.  I'm going to

4     ask you not to interrupt, if that's possible.  We'll

5     have counsel for the Appellant conduct the examination.

6          THE REGISTRAR:  Can we, for identification only,

7     label this as A2?

8          THE COMMISSIONER:  Yes.  A2 for identification,

9     three pages.

10              (Exhibit A2 was marked for identification.)

11     BY MR. MARKS:

12          Q.  Mr. Sloan, in the three years in question,

13     '98, '99 and 2000, how many pieces of art did you sell

14     through this art donation program?

15          A.  A round number, maybe 50,000.

16          Q.  And did you consider it to be a good deal

17     for you?

18          A.  It was a very good deal for me.

19          Q.  Why?

20          A.  You can see by the grosses they were doing a

21     very good job of selling.  And I thought that their

22     expenses were very high and they were covering their

23     own expenses to a certain extent, so therefore I

24     thought I was getting a very good price.

25          Q.  When the funds were received from the

31

1   purchasers of the art, do you know what happened to

2   them?  Who were they paid to?

3        A.   The funds for the purchasers of the art went

4   to Artistic Ideas.  I assume they went into their bank

5   account.

6        Q.   And then it was from that account that funds

7   were wired to you?

8        A.   Yes.

9        Q.   How did Artistic get paid the 50 percent fee

10  or commission?

11       A.   At the end of the year on the adjustment,

12  they basically took their fee.  They may have taken

13  some during the course of the year as well.

14       MR. MARKS:  Can I have a moment to consult with

15  my client, Your Honor?

16       THE COMMISSIONER:  Yes.  Would you like a short

17  break?

18       MR. MARKS:  Yes, thank you.

19            (Recess taken.)

20  BY MR. MARKS:

21       Q.   Mr. Sloan, when you were considering selling

22  your inventory of art in Canada, did you ever consider

23  setting up your own sales force or make arrangements

24  that way?

25       A.   I considered it.

                                                        32

1    Q.  And why did you decide not to do that?

2    A.  Way too expensive, too much work, too much

3    effort.  Just wasn't worth it.

4    MR. MARKS:  Those are all my questions, Your

5    Honor.

6    THE COMMISSIONER:  Thank you very much, counsel.

7    Mr. Derksen?

8    MR. DERKSEN:  Mr. Marks and I are just going to

9    switch spots here.

10    Thank you, Your Honor.

11

12                    CROSS-EXAMINATION

13    BY MR. DERKSEN:

14    Q.  Mr. Sloan, you until this morning have

15    refused to speak to my office about your involvement in

16    this matter; isn't that correct?

17    A.  Well, I put it in the hands of my business

18    manager.

19    Q.  Mr. Alpert?

20    A.  Yes.

21    Q.  And you understand that Mr. Alpert, on your

22    behalf, advised my office that you are not prepared to

23    be interviewed about your involvement with Artistic

24    Ideas and the arrangements you had with Artistic Ideas?

25    A.  Whatever he said.

                                                    33

1          Q.  You don't dispute that Mr. Alpert declined

2    my office's request to speak with you.

3          A.  I don't.

4          Q.  You were the president and sole shareholder

5    of Coleman Fine Arts?

6          A.  Yes.

7          Q.  And also Silver Fine Arts?

8          A.  Yes.

9          Q.  And were you also the CEO, chief executive

10   officer, of both of those companies?

11         A.  Yes.

12         Q.  And how about director?  Were you a director

13   of both of those companies?

14         A.  Yes.

15         Q.  I take it, Mr. Sloan, that you are aware

16   that Artistic Ideas and Mr. Grossman and Mr. Pearlman

17   had become involved in this litigation concerning this

18   proceeding.

19              You were aware of that?

20         A.  Yes.

21         Q.  And when did you first become aware of it?

22         A.  I don't remember.

23         Q.  Have you more recently, say, in the past

24   year, had occasion to discuss your recollection of

25   events concerning what transpired with you and

                                                          34

1    Mr. Grossman and Mr. Pearlman back in 1998, 1999, 2000,

2    2001?  Have you had occasion to speak with Mr. Pearlman

3    or Mr. Grossman about your recollection of the events?

4         A.   I really didn't get into any discussion with

5    them.

6         Q.   How about this past summer, July, August,

7    September?

8         A.   I spoke to them then.

9         Q.   And you discussed your evidence with them --

10   your recollection?

11        A.   My recollection.

12        Q.   And I take it some of that would have taken

13   place during a conference call?

14        A.   Was there a conference call?  Maybe.

15        Q.   You told us this morning, Mr. Sloan, that --

16   well, you understood that Allan Grossman, by

17   profession, is a chartered accountant?

18        A.   Yes.

19        Q.   And you understood that Mr. Mark Pearlman

20   was a chartered accountant by profession?

21        A.   Yes.

22        Q.   And that they were partners with a firm

23   known as Horwath and Ornstein?

24        A.   Yes.

25        Q.   And you understood that Mr. Grossman and

                                                        35

1  Mr. Pearlman didn't have a background in art galleries;
2  is that fair?
3          A.   It's fair.
4          Q.   And you told us this morning that you had a
5  background and ownership of some art galleries for
6  quite a number of years.
7          A.   Yes.
8          Q.   Did it strike you as odd, sir, that you were
9  using accountants to sell art?
10         A.   No.
11         Q.   Why not?
12         A.   Well, they have the ability to sell a
13  product, and whatever the product is, they learn it,
14  and once they learn it, they sell it.  And I don't
15  think they knew any more about software than they knew
16  about art.
17         Q.   Your company's -- first Coleman Fine Arts
18  Limited, that was a company, I take it, that would have
19  been incorporated for the purposes of this arrangement
20  with Mr. Grossman and Mr. Pearlman?
21         A.   Yes.
22         Q.   Back in September of '98?
23         A.   Yes.
24         Q.   And then Silver Fine Arts Limited, I
25  understand that it was incorporated later, but August

36

1    of 2000?

2          A.   Whatever.

3          Q.   Is there a reason why the second company was

4    incorporated?

5          A.   It was my accountant's idea.

6          Q.   And you've always been a director of both of

7    those companies?

8          A.   Yes.

9          Q.   Do you know, sir, someone by the name of

10   Edwin Metelits, M-e-t-e-l-i-t-s?

11         A.   Yes.

12         Q.   What association do you have with

13   Mr. Metelits?

14         A.   He was my accountant.

15         Q.   I'm going to pass you a document that's a

16   copy with a certificate from the State of California

17   with a date on the first page, February 15, 2005.  Take

18   a look at that, please.

19         MR. MARKS:  I'll take a page from my friend's

20   book.  I wonder if he has the original available?

21         THE COMMISSIONER:  Mr. Derksen?

22         MR. DERKSEN:  No, I don't.

23         MR. MARKS:  I object.

24         THE COMMISSIONER:  What do you propose to do

25   with it?

37

1      MR. DERKSEN: I'm going to ask Mr. Sloan if it's
2   possible that he's not a director of Silver Fine Arts.
3      THE WITNESS: I always assumed I was a director.
4      MR. MARKS: I think that my friend wants to use
5   a document to cross-examine. This witness can't
6   identify this document. It hasn't been introduced into
7   evidence in any other matter. It's not the original
8   document.
9      THE COMMISSIONER: I haven't heard Mr. Derksen
10  suggest that he intends to enter it as an exhibit at
11  this point. It would be at that point that the
12  authenticity of the document would come into play.
13  He's showing the witness a document and suggesting to
14  him that, in fact, he wasn't a director. I think it's
15  open to Mr. Derksen to do so.
16     MR. MARKS: Very well.
17  BY MR. DERKSEN:
18     Q. You've had an opportunity to look at this
19  document, sir?
20     A. Yes.
21     Q. Is it possible that you aren't a director or
22  officer of Silver Fine Arts Limited?
23     A. It's possible.
24     Q. Well, are you or aren't you?
25     A. I was under the assumption that I was a

                                                    38

1    director and an officer, but you're showing me a

2    document that shows me otherwise.

3        MR. MARKS:  In fairness to the witness, he's

4    showing a document that has a date on it and asking

5    him --

6        THE COMMISSIONER:  I don't think the witness was

7    admitting the contents of the document.  He was simply

8    saying he saw something that suggested he was not a

9    director.

10       MR. MARKS:  I'm objecting to the lack of

11   fairness in my friend's question because he made a

12   sweeping statement that this document appears to be

13   filed as of a certain date and may only represent the

14   state of affairs as of that date, and Mr. Sloan's

15   evidence may relate to a different time period.  So I'm

16   just suggesting that my friend, in fairness, relate his

17   questions to a time period.

18       THE COMMISSIONER:  If you believe there's any

19   confusion caused by the question asked by counsel and

20   the answer given by the witness, I'm going to invite

21   you to deal with that in redirect.

22       MR. DERKSEN:  Perhaps, then, we should mark the

23   document for the purposes of identification.

24       THE COMMISSIONER:  Do you propose -- are you

25   then proposing to have it identified at a later date?

39

1          MR. DERKSEN:  No.  I don't intend to try to
2     introduce it into evidence.  I don't have the original.
3     So I think it just stops at being a document that was
4     put to the witness.
5          THE COMMISSIONER:  Well, a document itself, I
6     don't believe, can be put in as an exhibit at this
7     point.  When a document is put in and marked for
8     identification, that is indicating it's subject to be
9     identified at a later point.  If you wish to try to do
10    that, it can be marked for identification, but in the
11    event you don't have the document identified, it would
12    not be part of the record.
13         MR. DERKSEN:  Very well.
14         Q.  Mr. Sloan, having looked at that document,
15    do you recognize that document?
16         A.  Do I recognize it?  I do now.
17         Q.  And what do you understand the document to
18    be?
19         A.  Well, it's obviously a state of
20    incorporation of a company.
21         Q.  For Silver Fine Arts Limited?
22         A.  Yes.
23         Q.  Have you seen the original of that document
24    before?
25         A.  I don't remember.

                                                    40

1       Q.  Very well.  You can just pass it back to me

2   then, please.

3           Sir, what was your understanding of how the

4   art donation program that Mr. Pearlman and Mr. Grossman

5   were involved in, how that program worked?

6       A.  My understanding was that they were going to

7   offer a group of art images to their purchasers for the

8   purpose of a purchase of 11 pieces to be donated to a

9   charity, and it was up to the investor to choose what

10  group he wanted to buy.

11      Q.  Did you have any understanding as to the

12  potential tax savings return on investment that this

13  program would generate for a potential purchaser?

14      A.  I had an idea.

15      Q.  And what was your understanding?

16      A.  I didn't know the exact numbers.  I just

17  knew it generated a deduction.

18      Q.  And you understood that Artistic Ideas would

19  go out and find potential purchasers who would become

20  donors of the artwork.

21      A.  Yes.

22      Q.  And you understood that Artistic Ideas

23  arranged for appraisers to appraise the artwork?

24      A.  Yes.

25      Q.  And you understood that Artistic arranged to

41