1  find charities who would accept donations of the

2  artwork?

3       A.  Yes.

4       Q.  And you understood that Artistic would get

5  the artwork into the hands of the charities on behalf

6  of the donors?

7       A.  Yes.

8       Q.  I take it you weren't involved in paying any

9  of the charities an amount based on the dollar value of

10  donation receipts issued by the charities?

11      A.  I was unaware of it.

12      Q.  Is it fair to say, Mr. Sloan, that your

13  companies, Coleman Fine Arts and Silver Fine Arts, had

14  no obligations insofar as Artistic Ideas art donation

15  program was operating?

16      A.  Would you repeat that question.

17      Q.  Is it fair to say that your companies,

18  Coleman Fine Arts and Silver Fine Arts, had no

19  obligations insofar as the operation of the art

20  donation program?  All you did was source the prints.

21  Is that fair so say?

22      A.  Yeah, that's fair to say.

23      Q.  And you understood that in order for

24  Artistic Ideas art donation program to work within this

25  donor market, they needed prints.  They needed you to

42

1    source prints?

2         A.  Yes.

3         Q.  And that was what attracted you as part of

4    the business venture; is that fair?

5         A.  Yes.

6         Q.  Were you involved in the approval of sales

7    to individual purchase donors?

8         A.  No.

9         Q.  Never got involved?

10        A.  Only in the case where there might have been

11   some form of a discount.

12        Q.  I'd like to ask you to turn up tab 2 of

13   Exhibit A1.  If we have an exhibit copy here.

14        THE COMMISSIONER:  The court has only brought

15   the one.

16        MR. MARKS:  You can use my copy.

17        THE COMMISSIONER:  Thank you, Mr. Marks.

18        MR. DERKSEN:  Do you mind if I just confirm it's

19   not marked up?

20        THE COMMISSIONER:  The record is Volume 1 of A1?

21        MR. DERKSEN:  That's correct.  Tab 2 of

22   Exhibit A1.

23        Q.  Mr. Sloan, I'm just passing you Exhibit A1,

24   and if you would, please turn up tab 2 of Volume 1, and

25   you should have in front of you a document headed

43

```
 1    "Purchase Agreement," dated December 29, 1998.
 2              Do you see that, sir?
 3         A.   Yes.
 4         Q.   Do you recognize this document?
 5         A.   Yes.
 6         Q.   What's the first time that you would have
 7    seen a document like what you're looking at at tab 2 in
 8    blank, not filled in with purchaser information?
 9         A.   I don't recall.
10         Q.   The preamble of the document on the first
11    page starts:
12              "Whereas the vendor is the owner of the art
13         collectively, the prints set out in schedule A
14         hereto."
15              Do you know what schedule A is?
16         A.   No.
17         Q.   Do you know, sir, what prints were being
18    sold to this particular purchaser?
19         A.   No.
20         Q.   Here it's Mr. Sachman, S-a-c-h-m-a-n.
21              Look at the last page of the document of
22    this tab, Mr. Sloan.  There's a signature under the
23    name Coleman Fine Arts Limited.
24              Do you recognize that signature?
25         A.   Yes.
                                                          44
```

1        Q.  Whose signature do you recognize that to be?

2        A.  Allan Grossman.

3        Q.  And had you approved Mr. Grossman to execute

4 this document on your behalf?

5        A.  Yes.

6        Q.  Talk a moment to look at the document, if

7 you need to.

8        Is it your understanding that this was the

9 document under which your company, Coleman Fine Arts,

10 would effectively sell prints to a donor purchaser?

11       A.  Since I wasn't involved in this document, I

12 don't know.

13       Q.  You have no real understanding of this

14 document.

15       A.  No.

16       Q.  And so when it says, "Whereas the vendor is

17 the owner of the art collectively, the prints set out

18 in schedule A hereto," and then in paragraph 1 it

19 starts, "the vendor hereby sells" -- I'm on page 1,

20 paragraph 1, Mr. Sloan -- "the vendor hereby sells,

21 assigns, transfers and conveys to the purchaser all

22 right, title and interest in and to the prints," and so

23 on, did you have any understanding as to what specific

24 prints were being sold through a document such as this?

25       A.  No.

45

1          Q.   But is it fair to say that on December 29,

2     1998, Mr. Grossman, on your behalf, was selling some

3     prints?

4          A.   Yes.

5          Q.   And lower, at the bottom of paragraph 1, the

6     second-to -- the second last line, reference is made --

7     if you need to take a look at that, reference is made

8     to "notwithstanding the fact that such prints are

9     stored at the premises of the vendor at Los Angeles,

10    California, or are in transit."

11              Were all of the prints stored with you?

12         A.   Yes.

13         Q.   And these prints that were being sold on

14    your behalf by Artistic Ideas, these were prints that

15    you owned?

16         A.   Well, not all.

17         Q.   When you say "not all," what do you mean?

18         A.   There were prints that I owned in my

19    inventory, and there were prints that I purchased.

20         Q.   Is it the case, sir, that some of the prints

21    that you purchased were actually being purchased after

22    the donation year?  So we take -- for example, this

23    agreement that we're looking at at tab 2 contemplates a

24    sale by Coleman Fine Arts, December 29, 1998.

25              Is it possible that you acquired prints in

                                                          46

1    1999 that pertained to this 1998 donation year?

2        A.    I have no knowledge of that.

3        Q.    You have no knowledge of that?

4        A.    No.

5        Q.    So you have no knowledge of acquiring prints

6    after the donation year.

7        A.    Right.

8        Q.    And when I say "donation year," you

9    understand that, for example, I'm referring to the 1998

10   donation year.

11       A.    Yes.

12       Q.    A calendar year.

13       A.    Yes.

14       Q.    If you would turn over to tab 5, please, of

15   Exhibit A1, Mr. Sloan.  I understand this to be a

16   listing of prints.  And you scan down the page, about

17   the tenth print down, Guitare Verte et Boutaille.  I'm

18   not a Francophone, so I'm terrible in the

19   pronunciation, but I will spell it.  G-u-i-t-a-r-e

20   V-e-r-t-e e-t B-o-u-t-a-i-l-l-e.

21           Do recognize that as a Picasso?

22       A.    Yes.

23       Q.    Is that something that you would have

24   transacted or sold as part of the prints sold in

25   your --

47

```
 1              A.   Yes.
 2              Q.   -- sold to the purchasers?
 3              A.   Absolutely.
 4              Q.   And further down, there's another Picasso,
 5       maybe about 20 prints down, Minotaure et Femme --
 6       M-i-n-o-t-a-u-r-e, et is e-t, and Femme is F-e-m-m-e --
 7       another Picasso print?
 8              A.   Yes.
 9              Q.   Something that you would have sold as part
10       of this transaction with the purchasers?
11              A.   Yes.
12              Q.   And then over on the second page about 11
13       down, Femme a la Guitare, F-e-m-m-e.  A la is a, l-a.
14       Guitare, G-u-i-t-a-r-e.  Another Picasso print.
15                   Something you would have sold in the
16       transaction with purchasers?
17              A.   Yes.
18              Q.   So just some examples of many of the prints
19       you would have sold; is that fair?
20              A.   Yes.
21              Q.   These three Picassos that I referred you to,
22       did those come from a business known as Museum Masters
23       International?
24              A.   Possibly.
25              Q.   Is it possible that you acquired those
```

48

1    prints from Museum Masters after the donation year?

2         A.   No.

3         Q.   Not possible?

4         A.   No.   Not if they were donated in that year.

5         Q.   Did you acquire some prints from Museum

6    Masters International?   Would you agree with that?

7         A.   Yes.

8         Q.   And is it fair that you would have been

9    paying somewhere between 10 to $20 for each print?

10        A.   Not correct.

11        Q.   Not correct?

12             What would you have paid?

13        A.   I don't remember exactly what I paid for

14   each piece, but it was substantially more than $20.

15        .Q.   More than 40?

16        A.   Yes.

17        Q.   More than 60?

18        A.   I don't know.   There were different prices

19   for different things.

20        Q.   How did that work?   Can you give me some

21   general explanation of how the prices worked?

22        A.   Well, certain pieces I bought in bulk, and

23   other pieces I didn't.

24        Q.   And pieces that you bought in bulk, what

25   would you have paid?

49

1          A.  Could have paid as low as $40 and could have

2   paid as high as $80.

3          Q.  As a generality, was there sort of an

4   average price of what you were paying?  You told us

5   that you sold about 50,000 prints.

6          A.  Is there an average price that I was paying?

7          Q.  Yes.

8          A.  No.  There wasn't an average price.

9          Q.  Did it -- did the price go over $60?

10         A.  Sometimes.

11         Q.  80?

12         A.  Yeah.

13         Q.  What was the most frequent price?

14         A.  Most frequent price was probably somewhere

15  between 40 and 60.

16         Q.  Is there a term in the art industry or the

17  limited edition print industry called "pulling," you

18  pull prints?

19         A.  You mean pulling prints regarding the

20  printing of them?

21         Q.  Yes.

22         A.  Yes.

23         Q.  And what's your understanding of that term?

24         A.  My understanding of that term?  That has to

25  do with the printing.

50

1      Q.   Is that how they're made essentially?

2      A.   Right.  How they're made.

3      Q.   Were any of the prints that were transacted

4   in this arrangement with Artistic Ideas, were any of

5   those prints that were being pulled specifically for

6   the sale through Artistic Ideas to these purchasers?

7      A.   None of these prints were printed at that

8   time if that's what you're suggesting.

9      Q.   So it's all old art?

10      A.   Yes.

11      Q.   How old?

12      A.   Which pieces are we talking about?

13      Q.   Generally.

14      A.   Generally, there would be no way to tell

15   you.  You'd have to give me a specific.

16      Q.   Well, did any of the art come from editions

17   that were published in the 1980s?

18      A.   Yes.

19      Q.   1990s?

20      A.   Yes.

21      Q.   As late as 1997?

22      A.   Depends.  I'd have to look at the list.

23      Q.   I'm going to pass you a document, sir.  It's

24   two pages.  The first page is headed -- kind of a

25   customs invoice, and there's a date over on the right

51

1   side, March 4, 1999.  And over on the left side,

2   vendor, Coleman Fine Art Limited.

3           Do you recognize this document, sir?

4       A.  Yes, I do.

5       Q.  What is this?

6       A.  Well, this is a customs invoice.

7       Q.  And do you recognize this as a copy of one

8   of the invoices that your company, Coleman Fine Arts,

9   would have transacted with back in --

10      A.  Yes.

11      Q.  Were you involved in the preparation of

12  documents such as this?

13      A.  No.

14      Q.  Who prepared them?

15      A.  They were prepared by Artistic Ideas.

16      Q.  Were they sent to you?

17      A.  Yes.

18      Q.  And what did you do with them?

19      A.  I checked them to see exactly what had to be

20  sent, and I used them for shipping.

21      Q.  So, for example, in this Canada customs

22  invoice, there's a purchaser's name over on the right

23  side of the document, League for Human Rights, B'nai

24  Brith Foundation.

25           Did you understand that as a charity that

52

```
 1   was to be receiving prints?

 2        A.   Yes.

 3        Q.   And the prints being shipped in the new

 4   year -- and when I say in the new year, March 4, 1999,

 5   is the way the arrangement worked that purchasers would

 6   acquire or buy the prints from Coleman in 1998, and

 7   then they would be shipped the following year, 1999?

 8        A.   Yes.

 9        Q.   So here, for example, March 4, 1999, this

10   would have been a shipment for the 1998 donation year?

11        A.   Yes.

12        Q.   If you look over on the second page, it's

13   headed MMI, Museum Masters International Limited.

14             Do you see that?

15        A.   Yes.

16        Q.   Do you recognize this?

17        A.   Yes.

18        Q.   What do you understand this to be?

19        A.   This was Museum Masters who shipped these

20   particular goods for me.

21        Q.   For you?

22        A.   Yes.

23        Q.   And I notice that in shipping the goods,

24   Museum Masters is reflecting a unit price of a thousand

25   dollars.
```

53

1          Do you see that?

2      A.  Yes.

3      Q.  So the document appears to reflect a

4   thousand dollars per unit, essentially a thousand

5   dollars per print.

6          What was your understanding of how that came

7   to be reflected on this commercial invoice?

8      A.  I think that that was the appraisal.

9      Q.  And so how did Museum Masters get that

10   information?

11     A.  From me.

12     Q.  And did you provide that information to all

13   of your sources of the prints?

14     A.  No.

15     Q.  Did you provide that type of information to

16   print companies or entities that were selling prints to

17   you for the purposes of shipment to Artistic Ideas?

18     A.  Yes.

19     Q.  Now, the commercial invoice is also dated

20   March 4, 1999.

21          So why is it that Museum Masters

22   International is transacting, if I can use that word,

23   with prints in March of '99 that concern the 1998

24   donation year?

25     A.  They were purchased in 1998.  I asked them

                                                        54

1  to hold them until I had invoices, and they shipped
2  them when I told them to ship them.
3        Q.  So your evidence is that you had acquired
4  these prints in 1998.
5        A.  That's correct.
6        MR. DERKSEN:  Now, the witness has identified
7  this document as a copy, and consequently the Crown
8  proposes that it be marked as an exhibit, as
9  Exhibit R5, Your Honor.
10       THE COMMISSIONER:  Mr. Marks?
11       MR. MARKS:  No objection.
12       THE COMMISSIONER:  The witness has identified it
13 sufficiently.  It will be marked as R5.
14          (Exhibit R5 was marked for identification.)
15       MR. DERKSEN:  Your Honor, I will pass you a
16 copy.
17       THE COMMISSIONER:  Thank you.
18       MR. DERKSEN:  And if the witness's copy could
19 eventually be marked as R5, please.
20       THE COMMISSIONER:  Could you please pass that
21 back to Madam Registrar to have it marked as an
22 exhibit.  Thank you.
23 BY MR. DERKSEN:
24       Q.  I'll pass you another document, sir.  It's
25 dated March 4, 1999, and it also bears the -- appears

55

1   to be the letterhead of Museum Masters International

2   Limited.

3            Do you recognize this document, sir?   I

4   notice there's a cc to Paul Sloan down at the bottom.

5        A.   Yes.

6        Q.   You recognize this document?

7        A.   Yes.

8        Q.   What do you understand this document to be?

9        A.   Well, this was a document that was just

10  confirming that she was sending a shipment.

11       Q.   It says Lynn Miller at Museum Masters?

12       A.   Yes.

13       Q.   So on March 4, 1999, she's writing to

14  Artistic Ideas with a cc to you, confirming that she's

15  sending a shipment?

16       A.   That's correct.

17       MR. DERKSEN:   I believe the witness has

18  identified this document sufficiently to have it

19  admitted.   If my learned friend has any objections the

20  Crown asks that it be tendered as Exhibit R6, Your

21  Honor.

22       MR. MARKS:   No objection.

23       THE COMMISSIONER:   R6.

24            (Exhibit R6 was marked for identification.)

25       MR. DERKSEN:   I'll pass a copy to Your Honor.

56

```
 1          THE COMMISSIONER:   Thank you.
 2   BY MR. DERKSEN:
 3        Q.   I'll ask you to look at another document
 4   dated March 4, 1999, on what appears to be a Museum
 5   Masters International letterhead.
 6             Do you recognize this document?
 7        A.   Yes.
 8        Q.   And what's your understanding of this
 9   document?
10        MR. MARKS:   Excuse me.  Could I have a copy?
11        MR. DERKSEN:   I apologize, Mr. Marks.
12        Q.   You were about to tell me what your
13   understanding was of this document, sir?
14        A.   I don't know what this is.
15        Q.   I'm sorry.  Maybe I misunderstood.  I
16   thought you told me you recognized it.
17        A.   I thought this was a shipping document, but
18   when I looked at it, I'm not sure what it is.
19        Q.   Did you notice that there are several
20   prints?  The third one down, Femme a la Guitare, that's
21   a print that we spoke about earlier, a Picasso print?
22        A.   Uh-huh.
23        Q.   And it indicates a quantity of three at $20,
24   extension, $60.
25             Is that what you were paying for that
```

57

1   Picasso print per unit?

2        A.   I don't think so.  I think -- I don't know

3   what this is, but I don't think so.  I don't remember

4   paying $20 to Marilyn Goldberg for anything.

5        Q.   Marilyn Goldberg was with Museum Masters?

6        A.   Yes.

7        Q.   And similarly, the print about ten down,

8   Guitare Verte et Boutaille, another one we referred to

9   earlier, another Picasso.

10       A.   Yes.

11       Q.   So you have no recollection, sir, of paying

12  $20 for any of these prints that are described on this

13  document?

14       A.   No.

15       Q.   You recognize them as all being Picassos?

16       A.   Yes.

17       Q.   And you never received a copy of this

18  document?

19       A.   I may have.  I don't remember.

20       Q.   Is it possible that you hadn't acquired some

21  of these prints until after the donation year?

22       A.   No.

23       Q.   You were prepared to go on hook for prints

24  before donors or purchasers had entered into --

25       A.   Yes.  I advanced a lot of money to various

                                                    58

1    broker dealers and to art dealers to acquire art.  It

2    was a common practice.  It's the only way you could

3    really buy at the right price.

4        Q.  So you advanced money to dealers -- you said

5    brokers --

6        A.  Yeah.

7        Q.  With respect to specific titles or just

8    generally a quantity of prints?

9        A.  Some cases respective titles, some cases

10   just a major advance.

11       Q.  On the understanding that they would supply

12   titles --

13       A.  Yeah.

14       Q.  I'll ask you to pass that document back to

15   me then, if you would, please.

16           I'll pass you another document, sir.  This

17   appears to be on Artistic Ideas letterhead, addressed

18   to you, Paul Sloan, dated February 17, 1999.

19           Do you recognize this document, sir?

20       A.  No, I don't.

21       Q.  You don't?  Is this something that you would

22   have received?

23       A.  Possibly.

24       Q.  There's a handwritten note down at the

25   bottom -- first of all, it appears to be from a Susan

                                                    59

```
 1   Read.
 2              Do you recognize that name?
 3        A.   Yes.
 4        Q.   And who do you understand Susan Read to be?
 5        A.   She was a manager of the Artistic Ideas
 6   office at the time.
 7        Q.   Did you have contact with her from time to
 8   time?
 9        A.   Yes.
10        Q.   And there's a note down at the bottom:
11             "P.S., the 19 units may not be pulled.  Send
12         orders as they currently stand."
13             And it's signed Sue, S-u-e.
14        A.   Yes.
15        Q.   Do you have any understanding of what that
16   note might refer to, sir?
17        A.   No, I don't.
18        Q.   If you could pass that back to me, please.
19             Sir, you understood that the way Artistic
20   Ideas was selling the prints in groups, that a
21   potential purchaser would select the group of prints?
22        A.   Yes.
23        Q.   Of various titles?
24        A.   Yes.
25        Q.   Were there occasions where particular groups
```

                                                                    60

1    that were being marketed by Artistic were no longer

2    available because of particular prints within that

3    group weren't available?

4         A.   Well, they might have been sold out.

5         Q.   So if you had a group of 11 prints, you

6    might have been able to come up with 10 of one print

7    but only 6 of another?

8         A.   They had x number of prints available to

9    them.  If the group got sold out, they would have to

10   offer something else.

11        Q.   Do you know if there were substitutions that

12   were just thrown in to make up groups?

13        A.   I don't know.

14        Q.   Charles Bragg, do you recognize that name as

15   an artist?

16        A.   Yes.

17        Q.   And Bragg is B-r-a-g-g.

18             Was Charles Bragg the source of some of the

19   prints that were transacted with Artistic?

20        A.   Yes.

21        Q.   Charles Bragg has a son, Charles Lynn Bragg.

22   Is that your understanding?

23        A.   Yes.

24        Q.   And did you also obtain prints through

25   Charles Lynn Bragg as part of these transactions

61

1     through Artistic?

2          A.   Yes.

3          MR. DERKSEN:  May I have a moment, please?

4          THE COMMISSIONER:  Let's take a break.  Ten

5     minutes.

6               (Recess taken.)

7     BY MR. DERKSEN:

8          Q.   Pass you another document, Mr. Sloan, that

9     appears to be some more custom shipping documents.  If

10    you would, please, take a look at that.

11         MR. MARKS:  Which document did you hand him?

12    Could you just describe it?

13         MR. DERKSEN:  Sure.

14         Q.   Mr. Sloan, I've passed you a document.  It's

15    four pages, and the first page over on the upper left

16    hand side of the page refers to Silver Fine Arts, care

17    of Glenn L. Curtis Associates.  And down at the bottom,

18    it references Russell, R-u-s-s-e-l-l, A. Farrow,

19    F-a-r-r-o-w, Limited.

20              Take a look at this document, sir.

21              Do you recognize this as another set of

22    shipping documents for prints that were shipped to

23    Aladdin's Children's Charity that concerned prints by

24    Charles Bragg and Charles Lynn Bragg?

25         A.   I assume.

                                                      62

1        Q.   And over on the second page down at the
2    bottom, I see your name, Paul Sloan.

3             So you would have been involved in providing
4    these documents for the purposes of shipment of Bragg
5    prints?

6        A.   Yes.

7        Q.   That were to go to Aladdin's Children's
8    Charity.

9        A.   Right.

10       Q.   And similar to the earlier document that we
11   looked at, if you would turn in, please, to page 3,
12   there's a document.   It's entitled at the top "Gallery
13   Detailed Bragg, CL."  Do you have that?  The third
14   page, sir.

15       A.   Yeah.

16       Q.   And is this a document that would have been
17   provided to you by Artistic, or was this something that
18   your companies produced for the purposes of shipping
19   the prints up through Canada customs and over to
20   Artistic Ideas?

21       A.   This would have been provided by Artistic.

22       Q.   To you for the purposes of shipment?

23       A.   That's correct.

24       Q.   And I see here the first print that's listed
25   on this third page, Bragg CL, do you understand that to

                                                        63

1  be Charles Lynn Bragg?

2       A.  Yes.

3       Q.  So African Watering Hole, you see that

4  there?  The first print?

5       A.  Yes.

6       Q.  Appraised value $6,300?

7       A.  Right.

8       Q.  You recognize that as one of the Charles

9  Lynn Bragg prints that were transacted with Artistic

10  Ideas and these purchasers?

11       A.  Yes.

12       Q.  And then over on the next page, the fourth

13  page, there's another document headed "Gallery Detailed

14  Bragg."

15           Do you understand this fourth page to

16  concern prints that were being shipped up to Artistic

17  for Aladdin's Children's Charity prints by Charles

18  Bragg?  Same idea as the earlier page?

19       A.  Yes.

20       Q.  And these Bragg prints would have been

21  transacted in the 2000 donation year?  That's the first

22  year that Silver Fine Arts came into existence?

23       A.  I assume.  I don't remember.

24       MR. DERKSEN:  Your Honor, it's the Crown's

25  position that Mr. Sloan has sufficiently identified

                                                    64

1   this document for the purposes of having it tendered as
2   an exhibit, and so the Crown moves to have this
3   tendered as Exhibit R7.

4        MR. MARKS:  I don't believe Mr. Sloan said that
5   he had ever seen this document before.  He did answer
6   some questions about it, which he said various things
7   like, "I assume," but I'm not sure that he did identify
8   the document.

9        THE COMMISSIONER:  What was your position,
10  Mr. Sloan?  Did you say that you recognize the
11  document?

12       THE WITNESS:  Yeah, I think I recognize it.
13       MR. MARKS:  Very well.  No objection.
14       THE COMMISSIONER:  Okay.  Exhibit R7.  Thank
15  you, sir.

16            (Exhibit R7 was marked for identification.)
17       MR. DERKSEN:  Your Honor, I'll just pass you a
18  clean copy.

19       THE COMMISSIONER:  Thank you.  And the witness
20  copy can be handed to down to the registrar, please.
21  BY MR. DERKSEN:

22       Q.  Next, Mr. Sloan, I pass you what appears to
23  be an invoice from Charles Lynn Bragg, dated May 24,
24  2001.  Would you take a look at that, please.
25            On the right side of the page, it appears to

65

1   be bill to Coleman Fine Arts Limited.

2          Do you see that, sir?

3      A.  Yes.

4      Q.  Do you recognize this as an invoice -- a

5   copy of an invoice that Charles Lynn Bragg issued to

6   you or your company, Coleman Fine Arts?

7      A.  Yes.

8      Q.  There's quantity reflected, 3,738 prints.

9        : Do you see that?

10     A.  Yes.

11     Q.  Is that -- does that accord with your

12  recollection of about what number of prints that you

13  would have acquired --

14     A.  I can't say for sure, but I assume.

15     Q.  Appears to be approximately correct.

16     A.  Yeah.

17     Q.  Is it fair so say that you were paying $40 a

18  print for the Charles Lynn Bragg prints?

19     A.  Yes.

20     Q.  And that would have included, for example,

21  the print, the African Watering Hole, we looked at

22  earlier with the appraised value of $6,300?

23     A.  If this came from Charles Bragg, it had --

24  oh, this is Charles Lynn Bragg.  Yes.

25     Q.  Now, Charles Lynn Bragg is invoicing you in

                                                          66

1    May of 2001.  So when, sir, did you acquire the titles

2    that were shipped as part of the 2000 donation year?

3         A.   I acquired them in 2000.

4         Q.   Why was he invoicing you in May of '01?

5         A.   Because I gave him a purchase order and this

6    is -- when he shipped it is when he billed me.

7         Q.   So he shipped the prints up to Artistic

8    Ideas for you?

9         A.   That's correct.

10        Q.   So these weren't prints that you had in your

11   inventory.

12        A.   No.

13        Q.   Were any of these prints created fresh for

14   these transactions through Artistic?

15        A.   I don't recall.

16        Q.   You don't recall?

17             Crown asks that this invoice dated May 24,

18   2001, from Charles Lynn Bragg to Coleman Fine Arts be

19   tendered and marked as Exhibit R8, please, Your Honor.

20        THE COMMISSIONER:   R8.  Can you hand your copy

21   down to the registrar.

22             (Exhibit R8 was marked for identification.)

23        MR. DERKSEN:   I pass Your Honor a clean copy.

24        THE COMMISSIONER:  Thank you.

25

67

```
 1    BY MR. DERKSEN:
 2         Q.   Sir, I'm passing you another document that
 3    appears to be an invoice, this time from Charles Bragg,
 4    and there's a date over on the top right.  Appears to
 5    be July 26, 2001.  And over on the left side, bill to
 6    Silver Fine Arts, ordered by Paul Sloan.
 7              Do you recognize this as a copy of an
 8    invoice from Charles Bragg with respect to prints that
 9    were transacted through Artistic Ideas?
10         A.   Yes.
11         Q.   And it refers to a quantity of 5,000
12    graphics.
13              Are those limited edition prints?
14         A.   Yes.
15         Q.   And does that number, 5,000, does that
16    accord with your recollection of the number of titles
17    approximately that would have come from Charles Bragg?
18         A.   I assume.
19         Q.   And the Bragg titles, is it fair to say that
20    you paid $40 per unit?
21         A.   Yes.
22         Q.   Now, Charles Bragg is invoicing you in July
23    of '01, and it's my understanding that there were
24    Charles Bragg prints in the 2000 donation year.
25              So sir, did you acquire these prints in
```

                                                              68

1    2001?

2        A.   I advanced Charles Bragg and Charles Lynn

3    Bragg consistent money on a regular basis, and then

4    they would send me a statement at the end, but this

5    wasn't necessarily what they would do.

6        Q.   I'm sorry.  This isn't necessarily what they

7    would do.  What do you mean?

8        A.   Well, if there was $200,000 involved, I may

9    have paid them 150,000, and the balance might have been

10   50,000.  This is just a bill.

11       Q.   Sir, when Allan Grossman signed the purchase

12   agreements on your company's behalf, say, for example,

13   in the 2000 donation year, did you own the prints at

14   the time they were purportedly being sold to the

15   donors --

16       A.   Yes.

17       Q.   -- the purchasers?

18            It's not a situation where you would, after

19   year end, communicate with Charles Bragg or Charles

20   Lynn Bragg and say, I need so many number of units?

21       A.   No.  I bought them during the course of the

22   year.  I may have bought more after the course of the

23   year as part of a package which I kept for the

24   following year.  But monies didn't always change hands

25   in full until they were shipped.

69

1          Q.   So you might not have paid for the prints at

2     the time you had sold them?

3          A.   I advanced -- I advanced all these artists

4     and my various dealers money.

5          MR. DERKSEN:   Crown asks that this invoice dated

6     July 26, 2001, from Charles Bragg to Silver Fine Arts

7     be tendered and marked as Exhibit R9, please, Your

8     Honor.

9          THE COMMISSIONER:   R9.   Once again, Mr. Sloan,

10    can I ask you to pass the copy you have down to the

11    registrar.

12               (Exhibit R9 was marked for identification.)

13         MR. DERKSEN:   I pass Your Honor a clean copy.

14         Q.   Sir, I'll pass you another letter from --

15    appears to be from Charles Bragg, dated August 14,

16    2001, addressed to Paul Sloan.   If you would take a

17    look at that, please, sir.

18               Do you recognize this as a letter that you

19    received from Charles Bragg?

20         A.   Yes.

21         Q.   It's a copy of a letter you received from

22    Charles Bragg?

23         A.   Yes.

24         Q.   And just so the record is clear, Mr. Sloan,

25    is this Charles Bragg or Charles Lynn Bragg that's

70

1    writing to you here?

2         A.   This is Charles Bragg.

3         Q.   And he write:

4              "Dear Paul, Irwin picked up the last of the

5         replacement pieces today.  There were only 11

6         pieces which we were unable to do."

7              What's your understanding of what that was

8    about?

9         A.   Obviously, these were damaged pieces.

10        Q.   Were they reprinted?

11        A.   He was to replace them.

12        Q.   So was he reprinting them or replacing them?

13        A.   I don't know.  It was up to him to replace

14   them.

15        Q.   Third paragraph, he writes:

16             "I still need to know about the four pieces

17        from this group, Camille, Camelot 1, and

18        Camelot 2 and John the 23rd that didn't quite

19        make the appraisal figure.  You said they were

20        close enough to use after we finished printing

21        the original order.  Let me know what you want

22        me to do on these pieces."

23             What's your understanding about what

24   Mr. Bragg is referring to?

25        A.   Well, from this letter, I would say that

71

1   these were not appraised at a high enough level and
2   that we didn't order them.
3        Q.  And when Mr. Bragg says "after we finish
4   printing the original order," what was the original
5   order that they were printing?
6        A.  I don't know.
7        Q.  Is it the case, sir, that they were printing
8   prints, graphic images for the purposes of this
9   program?
10       A.  That's possible.
11       Q.  The fourth paragraph, Mr. Bragg writes:
12           "I'm working on some large pieces that
13       should get appraisals of between 1,800 to
14       $2,200.  That should get our average up for the
15       new group.  I will send them to Edie this
16       August."
17           Do you understand that as a reference to
18   Edie Yeomans, the appraiser?
19       A.  Yes.
20       Q.  Sir, were you working with Charles Bragg
21   and Edie Yeomans to get appraisal values up?
22       A.  I never dealt with Edie Yeomans.
23       Q.  Did you understand Charles Bragg to be
24   working with Edie Yeomans?
25       A.  All artists would call the appraiser based

                                                    72

1    on something they thought should be included or not

2    included, and it was up to her as to whether she

3    listened to them or not.

4         Q.   You had no contact with Edie Yeomans?

5         A.   Very little contact.

6         Q.   Did you ever communicate with Charles Bragg

7    about the role that Edie Yeomans was playing?

8         A.   Well, he knew the process was that we sent a

9    sample to Edie Yeomans, along with Charles Rosoff, to

10   get appraised, and if they didn't appraise at a value

11   that we wanted to purchase them at, we weren't going to

12   purchase them.  It was up to him in some cases, not

13   all, to provide her with documentation.

14        If you look at her appraisal books, you'll

15   notice that she's extremely detailed, and she not only

16   checks one source but sometimes seven, eight, nine

17   sources.  Charles Bragg had a lot of sources of sales,

18   and if she didn't spot one, if he knew of one, I guess

19   he let her know.

20        Q.   Did you understand that Edie Yeomans was

21   relying on Charles Bragg as a source of information for

22   the purposes of the appraisal?

23        A.   No.  I don't think she was relying on him

24   for the purposes of appraisal.  Just for some

25   information occasionally.

73

1        MR. DERKSEN: Crown asks or tenders this letter

2  dated August 14, 2001, from Charles Bragg to Paul Sloan

3  as R10, please, Your Honor.

4        THE COMMISSIONER: R10.

5        THE WITNESS: I think you notice on the back of

6  this, there was a bill for 207,000, of which 200,000

7  was paid and only $7,500 was still due, which was the

8  advance that he received.

9  BY MR. DERKSEN:

10       Q.  Do you know when this was advanced?

11       A.  I couldn't tell you.

12         (Exhibit R10 was marked for identification.)

13       MR. DERKSEN: Pass Your Honor a clean copy.

14       THE COMMISSIONER: Thank you.

15  BY MR. DERKSEN:

16       Q.  Sir, you told us earlier this morning that

17  you had sold Dyanson Galleries some number of years

18  before 1998; is that correct?

19       A.  Yes.

20       Q.  What year did you sell the galleries?

21       A.  I think it was in the '95, '96 range.

22       Q.  And you told us that you were left with a

23  number of prints.

24       A.  Yes.

25       Q.  How is it that you came to be left, after

74

1    the sale of the gallery, with a number of extra prints?

2         A.   Well, these were personal prints that I

3    wanted and that the owner didn't that bought it.

4         Q.   Multiple copies of same -- multiple prints

5    of the same edition?

6         A.   Yes.

7         Q.   Was it old inventory that Dyanson couldn't

8    sell off?

9         A.   It was old inventory.  Dyanson wasn't really

10   in the business of selling prints.  They were in the

11   business of selling sculpture.

12        Q.   How is it that the gallery had acquired

13   these titles?

14        A.   Well, these titles were published many years

15   before.

16        Q.   So was Dyanson Galleries in the business of

17   also publishing prints?  When I say "publishing," I

18   mean producing images of limited editions?

19        A.   Sure.

20        Q.   How many years earlier?

21        A.   Ten years earlier and before that.  Some of

22   these prints were done back in the 1980s, before

23   Dyanson Galleries.

24        Q.   Had you been involved in any similar

25   arrangements where art was being sold, transacted, and

75

1   then donated for the purposes of charitable donation
2   credits?
3       A.  No.
4       Q.  The arrangement your companies had with
5   Allan Grossman and Mark Pearlman, Artistic Ideas, was
6   $3,500 would be split 50/50.
7       A.  Yes.
8       Q.  And sir, you understand the Crown's view
9   or -- I realize that you're not from Canada -- the
10  government's view that the appraisals at a thousand
11  dollars Canadian per print do not reflect the true fair
12  market value of the prints.  You understand that the
13  government has challenged that?
14      A.  On this basis or some other basis?
15      Q.  Just generally with respect to the donations
16  that were made by persons who acquired prints.
17      A.  They were challenged you mean in a different
18  court case?
19      Q.  Yes.
20      A.  Yes.
21      Q.  You honestly believed, though, that these
22  prints each had a fair market value of a thousand
23  dollars a piece?
24      A.  Yes.
25      Q.  11 for $11,000?

76

1      A.   Yes.

2          Q.   And is it the case, sir, that even though

3    you believed that these prints were worth $11,000, your

4    evidence is that you were prepared to pay Artistic

5    Ideas 50 percent as a commission because they would get

6    you $3,500 for prints that you thought were worth

7    11,000?

8      A.   Yes.

9          Q.   Have you ever bought and sold a car?

10     A.   Yes.

11         Q.   Have you ever sold a car that you thought

12   was worth $10,000 for $3,500 and given someone a

13   commission of 50 percent for doing that for you?

14     A.   If I needed the money, I might have, but I

15   didn't.

16         Q.   Were you desperate for money here in this

17   instance?

18     A.   No.

19         Q.   It doesn't really make sense, does it?

20     A.   I don't understand.

21         Q.   You wouldn't sell a car that was worth

22   $10,000 for $500 and give the --

23     A.   I think that's a bad analogy.

24         First of all, in the art business, price is

25   in the eyes of the beholder as to what they're willing

                                                    77

1   to pay and not pay.  You can go on eBay and find pieces

2   of art at $3,500 that you think are only worth a

3   thousand and you can find pieces that are worth 2,000

4   that might be selling for 500.  The valuations are

5   based upon sales, price history, the artist, the

6   background, et cetera.  It isn't necessarily the

7   retail.  It isn't necessarily the wholesale.  But

8   that's the value.

9        Q.   You haven't kept any notes regarding your

10  discussions with either Mr. Grossman or Mr. Pearlman

11  with respect to the arrangements that were entered into

12  back in 1998 and that were continued through to 2001?

13       A.   No.

14       Q.   So nothing in writing?

15       A.   Not that I'm aware of. .

16       Q.   And sir, you agree that you transacted well

17  over $20 million worth of business without documenting

18  that arrangement with Artistic?

19       A.   Yes.

20       Q.   I suggest to you, sir, that you never

21  discussed the idea that your companies would pay a

22  commission to Artistic Ideas and that the arrangement

23  was simply that the $3,500 being paid by the donors

24  would be split 50/50.

25            Isn't that what happened?

78

1        A.   Well, that's just semantics.

2        Q.   That's semantics?

3        A.   We didn't discuss it that way, no.  I

4   offered them the commission because that's what they

5   wanted.

6        Q.   That's what they wanted?

7        A.   That's what they wanted, and that was the

8   structure they wanted, and I agreed to it.  And when I

9   thought of the costs involved and what they were going

10  to spend and how they were going to have to go about

11  this, it was very reasonable.

12       Q.   And from your perspective, there was no

13  reason to pay a commission when you simply could have

14  split the proceeds 50/50.  From your perspective,

15  there's no reason for you to pay a commission to

16  Artistic Ideas when they need your art for your art

17  donation program and it had no impact on your bottom

18  line.  You got 50 percent, subject to some minor

19  discounts.  Isn't that fair?  There's no reason to pay

20  a commission.

21       A.   I'm not going to comment on that.

22       Q.   But this is how Allan and Mr. Pearlman --

23  Allan Grossman and Mr. Pearlman wanted to structure the

24  arrangement?

25       A.   Yes.

                                               79

1          MR. DERKSEN:  Let me have a moment, Your Honor,

2   please.

3          THE COMMISSIONER:  Yes.

4   BY MR. DERKSEN:

5          Q.  Did Mr. Grossman and Mr. Pearlman say why

6   they wanted to structure the arrangement this way,

7   according to your explanation that you would pay them a

8   commission?

9          A.  They didn't tell me why.

10         Q.  Did it strike you as odd?

11         A.  Well, when you get involved with tax, you

12  know, consequences and donations, no, it didn't strike

13  me odd.  It could be anything.

14         MR. DERKSEN:  Thank you, Your Honor.  Mr. Sloan,

15  I have no further questions.

16         THE COMMISSIONER:  Thank you.  Mr. Marks, would

17  you like a few minutes?

18         MR. MARKS:  I could use five minutes.

19              (Recess taken.)

20

21              REDIRECT EXAMINATION

22  BY MR. MARKS:

23         Q.  Just a couple of questions, Mr. Sloan.

24              You were asked by Mr. Derksen about your

25  lack of willingness to be interviewed by the government

80

1    lawyers, and you said that you left it to Mr. Alpert to
2    respond.
3         A.   That's correct.
4         Q.   Do you know if Mr. Alpert sent a letter
5    indicating --
6         A.   Mr. Alpert, I think, did send a letter.
7         Q.   And did you see that letter?
8         A.   Yes, I did.
9         Q.   I'm going to show you now a copy of that
10   letter dated July 11, 2006.
11             I only have one copy of it, Your Honor.
12             Is that a letter that Mr. Alpert sent on
13   your behalf?
14        A.   Yes.
15        Q.   And this is a letter from Mr. Alpert to
16   Mr. Derksen; correct?
17        A.   Yes.
18        Q.   And did that letter accurately set out your
19   position?
20        A.   Yes.
21        MR. MARKS:   I'll have that marked as the next
22   exhibit, Your Honor.
23        THE COMMISSIONER:   It will be A3.
24             (Exhibit A3 was marked for identification.)
25

81

1       MR. MARKS:  And I'd like to show Mr. Sloan
2   Exhibit R8, please.
3       Q.  Mr. Sloan, a number of times in talking
4   about the orders for prints and shipping of prints, you
5   said that you paid advances to various galleries or
6   brokers.  And on this invoice, Exhibit R8, at the
7   bottom of the page, there's a reference to an amount
8   paid and an amount due.
9       A.  Yes.
10      Q.  What does that indicate?
11      A.  I paid them a $125,000 advance, and he was
12  only due $24,000 when he shipped.
13      Q.  Thank you.
14          I'd also like to show Mr. Sloan Exhibits R7
15  and R5.
16          I'm sorry.  That was my mistake.  It's R7
17  and R9.  I apologize.
18          So R7 is the shipping document that was
19  referred to that deals with the period January 1, '01,
20  to December 31, '02, and there's a document from
21  Russell A. Farrow?
22      A.  Yes.
23      Q.  And attached to that, there were two lists
24  of prints, one for CL Bragg, and one for -- one that
25  just says Bragg.  Right?

                                                    82

1          A.   Yes.

2          Q.   If you can turn to the one that relates to

3     Bragg -- that's Charles Bragg, you said; correct?

4          A.   Yes.

5          Q.   And that indicates that for this particular

6     shipping document, there were a total of 775 prints

7     involved?

8          A.   Yes.

9          Q.   And then if you could turn to Exhibit R9.

10    This was the July 26, 2001 invoice from Charles Bragg.

11             And what quantity of prints did that deal

12    with?

13         A.   5,000.

14         Q.   So what does that tell you, if anything,

15    about when the prints that were referred to in the --

16    in Exhibit R7 were purchased?

17         A.   When were they purchased?

18         Q.   Yes.

19         A.   They were purchased in 2000.

20         Q.   And the -- and you indicated that you were

21    continuously acquiring prints.

22         A.   Yeah.   From Charles Bragg and Charles Lynn

23    Bragg.   I continuously had them on payroll.

24             MR. MARKS:   Those are all my questions.   Thank

25    you.

                                                          83

1      THE COMMISSIONER:  Thank you.

2      Mr. Sloan, I have a few questions, a few points

3  I'd like to clarify with you if I may, please.

4      I understood you to say -- maybe I'll just ask

5  you to repeat the particulars of the arrangement you

6  had with Artistic Ideas for the payment of any amounts

7  to them relating to the artwork in question.

8      THE WITNESS:  We had an arrangement where they

9  were my agents and they were allowed to deduct.

10  50 percent of any monies that came in for the package

11  of prints that they sold, less whatever deductions that

12  we agreed upon.

13      THE COMMISSIONER:  They were, you said, I

14  believe, paid a commission of 50 percent.

15      THE WITNESS:  Yes.

16      THE COMMISSIONER:  And now you said that there

17  were certain amounts deducted.

18      Was that deducted from their commission or --

19      THE WITNESS:  Well, actually, it was deducted

20  from both of us.  Some were referring to my liability,

21  and some were referring to a shared liability.

22      THE COMMISSIONER:  Can you give me an example of

23  both, please?

24      THE WITNESS:  The appraisals were my liability.

25  The legal bill was a shared liability.  The custom

84

1  charges were a shared liability. The minor wiring
2  charges were my liability. And there were some
3  incidental charges that were my liability, but
4  discounts were a shared liability.
5       THE COMMISSIONER: All discounts were shared
6  liabilities?
7       THE WITNESS: No, not all discounts. I think
8  there were some that were not my responsibility.
9       THE COMMISSIONER: So discounts generally -- if
10 they were approved --
11      THE WITNESS: If they were approved.
12      THE COMMISSIONER: But is it fair to say that
13 Artistic Ideas could discount the sale price of the
14 works if they absorbed the discount out of their
15 50 percent commission?
16      THE WITNESS: Yes.
17      THE COMMISSIONER: You've stated, then, you were
18 liable for the appraisal fees, for wiring charges, and
19 incidental amounts.
20      What type of amounts are in the category of
21 incidental amounts?
22      THE WITNESS: Some shipping charges, some custom
23 charges.
24      THE COMMISSIONER: Anything else you can think
25 of?

85

```
 1            THE WITNESS:  Well, the discount we mentioned.
 2   Legal.
 3            THE COMMISSIONER:  You said that those were
 4   shared liabilities.  I was --
 5            THE WITNESS:  I can't think of anything else.
 6            THE COMMISSIONER:  Anything else -- any other
 7   items that were your liability alone besides appraisal,
 8   wiring charge, and the shipping charges -- some
 9   shipping charges and custom charges?
10            THE WITNESS:  Can I review that for a second?
11            THE COMMISSIONER:  That will be Exhibit A2 for
12   identification.
13            THE WITNESS:  Taxes were, I think, custom
14   charges.
15            THE COMMISSIONER:  Were your liability?
16            THE WITNESS:  We were shared liability on that.
17            THE COMMISSIONER:  Customs?
18            THE WITNESS:  Yeah.
19            And I shared some liability on their brokerage
20   charges which had to do with shipping.  That's really
21   it.
22            THE COMMISSIONER:  When you said earlier that
23   you had some incidental amounts that you were liable
24   for including some custom charges, was that an error
25   or --
```

86

1   THE WITNESS: I'm sorry. What did I say?
2   THE COMMISSIONER: I was asking you for examples
3 of liabilities that were incurred by Silver Fine Arts
4 and the Coleman Fine Arts alone, not shared with
5 Artistic Ideas. One of the categories of expenses that
6 you said were your liability alone were incidental
7 amounts. You gave examples of those incidental amounts
8 of some shipping charges and custom charges. Later on,
9 after looking at Exhibit A2, you said that custom
10 charges were shared. I'm trying to clarify your
11 answer.
12   THE WITNESS: Some custom charges were shared
13 and some were not. It's strange the way I did that.
14 But for the most part, most custom charges were mine.
15 Sometimes there were some mistakes that the
16 administration made.
17   THE COMMISSIONER: That is the administration of
18 whom?
19   THE WITNESS: Paperwork.
20   THE COMMISSIONER: Paperwork done by whom?
21   THE WITNESS: Artistic. Small incidental
22 things.
23   THE COMMISSIONER: Most custom charges were
24 yours, and all shipping charges were yours?
25   THE WITNESS: Yes.

87

```
 1              THE COMMISSIONER:  Did you pay those shipping
 2     charges directly, or were they paid by --
 3              THE WITNESS:  I paid them directly.
 4              THE COMMISSIONER:  You paid them directly.
 5              And the customs charges?
 6              THE WITNESS:  They paid them and then charged
 7     back to me.
 8              THE COMMISSIONER:  Would that be the same for
 9     the legal fees?  They were paid by Artistic Ideas and
10     charged back?
11              THE WITNESS:  And then charged back to me.
12              THE COMMISSIONER:  What kind of legal fees would
13     those be?
14              THE WITNESS:  I think these were some legal fees
15     to -- what was the name of the law firm?
16              THE COMMISSIONER:  I'm sorry.  You're going to
17     have to --
18              THE WITNESS:  It was a law firm involved --
19     Graham.  I can't think of the name of the firm totally.
20              THE COMMISSIONER:  Was that in Canada or --
21              THE WITNESS:  In Canada.  Graham Turner is the
22     firm.
23              THE COMMISSIONER:  What were those fees for as
24     far as you can recall?
25              THE WITNESS:  I think they were for the legal
```

88

1    opinion.

2         THE COMMISSIONER:  Legal opinion relating to
3    what?

4         THE WITNESS:  Relating to the donation.

5         THE COMMISSIONER:  To the donation -- art
6    donation arrangement?

7         THE WITNESS:  Yes.

8         THE COMMISSIONER:  And the brokerage charges,
9    were those amounts paid by Artistic Ideas and then
10   charged back to you in part?

11        THE WITNESS:  Yes.

12        THE COMMISSIONER:  And as well -- let's see.
13   Were there any other amounts charged back to you, can
14   you think?

15        THE WITNESS:  I don't see anything else.  Wire
16   charges.  That's sort of insignificant.

17        THE COMMISSIONER:  Wiring charges were charged
18   back to you?

19        THE WITNESS:  Yes.

20        THE COMMISSIONER:  Although you said that those
21   were your liability alone.

22        THE WITNESS:  Yes, they were my liability alone.

23        THE COMMISSIONER:  And the reference on
24   Exhibit A2 for identification, taxes, what were those
25   taxes?

89

1          THE WITNESS:  I think they refer to custom

2     charges.

3          THE COMMISSIONER:  Did you require any

4     documentation from Artistic Ideas with regard to the

5     sales discounts that were accepted?

6          THE WITNESS:  No.

7          THE COMMISSIONER:  You took Artistic Ideas' word

8     for the fact that certain items were discounted to

9     purchasers?

10          THE WITNESS:  Yes.

11          THE COMMISSIONER:  Did you receive copies of the

12     sale or purchase agreements signed on your behalf by

13     Artistic Ideas?

14          THE WITNESS:  No.

15          THE COMMISSIONER:  Have you ever seen them?

16          THE WITNESS:  I saw them today.  I hadn't seen

17     them, no.

18          THE COMMISSIONER:  You said that you felt that

19     this arrangement was satisfactory to you, that is, that

20     you simply received payment from Artistic Ideas for the

21     sale of the art -- well, you received these payments

22     without any documentation accompanying them because you

23     really had nothing to lose.  I think that's what your

24     answer was.

25          THE WITNESS:  Well, I really wasn't involved in

90

1    the administration or the aspects of the donation.  So

2    the only thing I needed was the adjustment we made at

3    year end.

4        THE COMMISSIONER:  You said that you were paid,

5    for the most part, in full prior to shipping the art?

6        THE WITNESS:  Yeah, yes.

7        THE COMMISSIONER:  And what did you mean by

8    "paid, for the most part, in full"?

9        THE WITNESS:  Well, sometimes because of the

10   discount or some money due there may have been some

11   small amount left over that would be paid, you know,

12   sometime in the three- or four-month period into the

13   next year.

14       THE COMMISSIONER:  So you were receiving

15   substantially all of the amount due to --

16       THE WITNESS:  I would say 98 percent.

17       THE COMMISSIONER:  And that was on an ongoing

18   basis, you would receive these amounts from Artistic

19   Ideas?

20       THE WITNESS:  Yes.

21       THE COMMISSIONER:  And your recollection, I

22   believe, with respect to price discounts was that there

23   weren't many discounts in the first year.

24       THE WITNESS:  No.  There weren't many.

25       THE COMMISSIONER:  On Exhibit A2 it shows sales

91

1   discounts of apparently $325,000.

2         THE WITNESS: Uh-huh.

3         THE COMMISSIONER: And that would have been the

4   share incurred by?

5         THE WITNESS: It's a shared number.

6         THE COMMISSIONER: So the total amount of the

7   discounts would have been $650,000?

8         THE WITNESS: Yes.

9         THE COMMISSIONER: Do you recall the number of

10   discounts that that would have entailed?

11         THE WITNESS: No.

12         THE COMMISSIONER: What range of discounts was

13   acceptable to Coleman and Silver?

14         THE WITNESS: Well, there wasn't any real range

15   of discount, to be honest with you. It only happened

16   infrequently except maybe in the first year. Somebody

17   who wanted a big purchase might have bought, you know,

18   a hundred units, so to speak, or 50 units, we might

19   give them 10 percent off or something like that.

20         THE COMMISSIONER: And would you talk to someone

21   at Artistic Ideas each time a discount was proposed?

22         THE WITNESS: Yes. Allan Grossman would call

23   me.

24         THE COMMISSIONER: Phone you.

25         THE WITNESS: Yes.

92

1          THE COMMISSIONER:  And that was the case
2    throughout the years in question?
3          THE WITNESS:  Yes.
4          THE COMMISSIONER:  Throughout the entire period
5    you did business with Artistic Ideas?
6          THE WITNESS:  Yes.
7          THE COMMISSIONER:  You don't recall the
8    frequency of the calls in which you discussed
9    discounts?
10         THE WITNESS:  They weren't significant in the
11   scope of things.
12         THE COMMISSIONER:  Weren't significant except
13   for the first year?
14         THE WITNESS:  Even that wasn't significant if
15   you think of the gross.
16         THE COMMISSIONER:  And if I show you page 2 and
17   page 3 of Exhibit A2, it shows in the first -- I'm
18   sorry.  Second page in the second-year discounts --
19   shows the figure to your companies 752,000.
20         So that would have been a discount in excess of
21   $1.5 million or discounts totaling in excess of
22   $1.5 million?
23         THE WITNESS:  I guess so.
24         THE COMMISSIONER:  And similarly on page 3,
25   subsequent year discounts, your portion would be

93

1    914,000-some dollars, therefore discounts in excess of

2    $1.8 million?

3         THE WITNESS:  This says less sales discount and

4    adjustments, so I don't think that number is just sales

5    discounts.  There's an adjustment.  Sometimes it had to

6    do with some other sales.  That sounds like more than I

7    would think for discounts.

8         THE COMMISSIONER:  What other adjustments would

9    there be, significant adjustments, to the sale price of

10   the art to be shared between your companies and

11   Artistic Ideas, then?

12        THE WITNESS:  I think advances.

13        THE COMMISSIONER:  Advances.

14        Well, if you look down at the page, it seems

15   that net payable is already taking into account amounts

16   already paid; is that right?  Less payments.  So that

17   seems to account for advances there, doesn't it?

18        THE WITNESS:  Yes, it does.

19        THE COMMISSIONER:  And you've given me a list of

20   all of the items that you say were shared expenses

21   between Artistic Ideas and --

22        THE WITNESS:  Oh, I know what that is.  Now I

23   recall what that is.  We had a fund that went into

24   legal expenses.  And they weren't just discounts.  It

25   was money being taken from me to go into a fund.

                                                      94

1    THE COMMISSIONER: What was that fund for?

2    THE WITNESS: That was for any legal expenses

3    that would occur.

4    THE COMMISSIONER: And what nature of legal

5    expenses did the parties envision might occur?

6    THE WITNESS: Sometime in the future if somebody

7    sued them.

8    THE COMMISSIONER: To offset any potential legal

9    fees or legal challenges?

10    THE WITNESS: Yes.

11    THE COMMISSIONER: So that was included in that

12    amount?

13    THE WITNESS: Yes. In fact, the amount of those

14    adjustments were $50 per unit.

15    THE COMMISSIONER: $50 per unit.

16    THE WITNESS: Yes.

17    THE COMMISSIONER: If I could direct your

18    attention to another line on the third page,

19    approximately two thirds of the way down the list,

20    amount withheld in trust for legal reserve, 23 times

21    50, a separate amount.

22    THE WITNESS: Oh, you're right. I didn't see

23    that.

24    THE COMMISSIONER: Besides that type of

25    adjustment, can you think of any other adjustment that

95

1    could have been included in the line we were looking at

2    before in each of the sheets, that is, less sales

3    discounts/adjustments?

4           THE WITNESS:   No.

5           THE COMMISSIONER:   So is it likely that the

6    amounts shown on that line less sales discounts would

7    be for the sales discounts?

8           THE WITNESS:   Would have to be, right.

9           THE COMMISSIONER:   So you say despite there

10   being adjustments in these years, especially the latter

11   two years, over 1.5 million, over $1.8 million, that

12   all of those adjustments were done or all of the

13   details of adjustments were done over the phone with

14   Mr. Grossman?

15          THE WITNESS:   Yes.

16          THE COMMISSIONER:   And that they were done in a

17   series of phone calls that you described earlier as not

18   being frequent?

19          THE WITNESS:   Yes.

20          THE COMMISSIONER:   And you did not maintain any

21   paperwork or require any paperwork from Artistic Ideas

22   to support the amount of discounts that were being

23   charged against your entitlements?

24          THE WITNESS:   That's correct.

25          THE COMMISSIONER:   And can you explain how it is

                                                            96

1  that your recollection earlier today of the amount of

2  discounts that were given and shared between Artistic

3  Ideas and your companies was insignificant except for

4  the first year when, in fact, the paperwork that you've

5  identified as being year-end totals show significant

6  discounts?

7      THE WITNESS:  Just slipped my mind.  I didn't

8  remember.

9      THE COMMISSIONER:  Can you explain to me why

10  your companies would have agreed to contribute to a

11  legal fund of the type that you described?

12      THE WITNESS:  Well, it was just something that I

13  didn't think was important, but they thought it was

14  important, so I went along with it.

15      THE COMMISSIONER:  You agreed to -- at least

16  according to Exhibit A2 for identification, you agreed

17  to contribute $108,650 for year ending January 31,

18  2000, simply because Mr. Grossman and Mr. Pearlman

19  thought it was a good idea?

20      THE WITNESS:  Yes.

21      THE COMMISSIONER:  And did you have any other

22  discussions with them about the nature of the fund or

23  the terms in which that money would be held?

24      THE WITNESS:  Yes.  It was supposed to be held

25  in escrow, and if not spent, I would get it returned

97

```
 1    over a three-year period.

 2              THE COMMISSIONER:  Over a three-year period.

 3         And what information did you receive subsequent

 4    to January 31, 2001, with respect to that amount held

 5    in trust?

 6              THE WITNESS:  I was told it was all spent.

 7              THE COMMISSIONER:  And did you receive any

 8    documentation from Artistic Ideas or from Mr. --

 9              THE WITNESS:  I did receive some documentation.

10              THE COMMISSIONER:  And what did that

11    documentation consist of?

12              THE WITNESS:  It consisted of checks that went

13    out for legal bills.

14              THE COMMISSIONER:  And can you -- you said that

15    you went along with this idea to create the trust fund,

16    this legal fund, but other than the fact that this was

17    asked of you, did you have any view as to why Coleman

18    and Silver Fine Arts would have any reason to

19    contribute to the fund?

20              THE WITNESS:  Well, the only reason I

21    contributed to the fund was because they were doing

22    such a good job that I felt there wasn't any point to

23    saying no.  They were selling more than I thought.

24              THE COMMISSIONER:  And you had, I take it, at

25    the outset of the arrangements with Artistic Ideas,
```

                                                              98

1    thought that that was an expense that should have been

2    borne by Artistic Ideas?

3           THE WITNESS:  Yes.

4           THE COMMISSIONER:  Can you tell me -- I'm going

5    to draw your attention again to page 3 of Exhibit A2

6    for identification.  There's an item charged to Coleman

7    and Silver, out-of-pocket expenses, $121,861.

8           Do you recall what those out-of-pocket expenses

9    would have been?

10          THE WITNESS:  I don't remember.

11          THE COMMISSIONER:  Do you recall receiving any

12   documentation with respect to out-of-pocket expenses?

13          THE WITNESS:  No.

14          THE COMMISSIONER:  You said that Artistic Ideas

15   paid for certain appraisals of the art; is that right?

16          THE WITNESS:  No.  They fronted all the

17   appraisal costs, but then charged it back to me.

18          THE COMMISSIONER:  Charged it back to you at the

19   end of the year?

20          THE WITNESS:  I think that's what that is.  I

21   think that's the appraisals.

22          THE COMMISSIONER:  The appraisal fees?

23          THE WITNESS:  Yeah.  They were very loose on

24   their accounting and what have you.

25          THE COMMISSIONER:  Less sales discounts -- I'm

99

1   sorry.  They were loose on their accounting?

2          THE WITNESS:  They were very loose.

3          THE COMMISSIONER:  Did that concern you?

4          THE WITNESS:  We both had an arrangement, like a

5   friendly arrangement, and I went along with it, but

6   sometimes Jeanine, who was managing, didn't put

7   everything down in writing.

8          THE COMMISSIONER:  And you're saying --

9          THE WITNESS:  I'm pretty sure that's what that

10  was because I don't see any appraisal fees on there.

11         THE COMMISSIONER:  And so what amount of

12  appraisal fees were paid?

13         THE WITNESS:  What amount was paid?  That was

14  the amount.

15         THE COMMISSIONER:  Where it says "less sales

16  discount adjustments"?

17         THE WITNESS:  No.  No.  This is not the page.

18         THE COMMISSIONER:  I'm sorry.  You may be

19  referring to page 3.  Oh, out-of-pocket expenses.

20         THE WITNESS:  Out-of-pocket expenses, $121,000.

21  I think that was the -- that was definitely -- and I

22  think included in the sales discount and adjustments

23  were the appraisals.

24         THE COMMISSIONER:  The appraisals were included

25  under a heading "less sales discounts and adjustments"?

                                                    100

```
 1          THE WITNESS:  I think so.  And they would come
 2   to 150, $200,000.
 3          THE COMMISSIONER:  And otherwise, each of the
 4   other items were broken down into particular
 5   categories, lawyer, brokerage, wire charges?
 6          THE WITNESS:  Uh-huh.
 7          THE COMMISSIONER:  And you said there were
 8   substantial amounts being paid to appraisers?
 9          THE WITNESS:  Yeah.
10          THE COMMISSIONER:  And that -- did you receive
11   any copies of the --
12          THE WITNESS:  I did receive some copies.
13          THE COMMISSIONER:  Copies of what?
14          THE WITNESS:  Of invoices that they paid to Edie
15   Yeomans and Charles Rosoff.
16          THE COMMISSIONER:  And when did you receive
17   those?
18          THE WITNESS:  Roughly around the same time as
19   this.
20          THE COMMISSIONER:  Roughly around the same time
21   as A2?
22          THE WITNESS:  Yeah.
23          THE COMMISSIONER:  So the only information you
24   received from Artistic Ideas would have been appraisal
25   bills and these three sheets?
```

                                                            101